# Jim DuPREE et al *v.* ALMA SCHOOL DISTRICT NO. 30 of Crawford County et al

82-175                                              651 S.W.2d 90

Supreme Court of Arkansas
Opinion delivered May 31, 1983

*Friday, Eldredge & Clark,* by: *George Pike, Jr.,* for appellants Little Rock School District and North Little Rock School District.

*Seay & Bristow,* by: *Bill W. Bristow,* for appellants Clover Bend School District et al.

*Dailey, West, Core, Coffman & Canfield,* by: *Ben Core; Stephen L. Spitz;* and *Long & Silverstein,* by: *David Long,* for appellees.

*Pryor, Robinson & Barry,* by: *H. Clay Robinson,* for *amicus curiae,* the Fort Smith School District.

*Cearley, Mitchell & Roachell,* for *amicus curiae,* the Arkansas Education Association.

STEELE HAYS, Justice. The issue presented on appeal is the constitutionality of the current statutory method of financing public schools in Arkansas under Act 1100 of 1979, the Minimum Foundation Program and vocational funding under § 7 of Act 1004 of 1975 (authorized under Act 363 of 1967). Appellees, eleven school districts[1], brought this class action suit against appellants, Jim DuPree and other members of the Arkansas State Board of Education (also

---

[1]Alma, Mulberry, Van Buren, Conway, Lake Hamilton, Sheridan, Paris, Cabot, Bryant, Greenwood, Mansfield.

joined by other districts[2]), charging that the present system violates the state constitution's guarantee of equal protection (Art. II, §§ 2, 3, 18[3]) and its requirement that the state provide a general, suitable and efficient system of education (Art. XIV § 2[4]). The appellees' basic contention is the great disparity in funds available for education to school districts throughout the state is due primarily to the fact that the major determinative of revenue for school districts is the local tax base, a basis unrelated to the educational needs of any given district; that the curent state financing system is inadequate to rectify the inequalities inherent in a financing system based on widely varying local tax bases, and actually widens the gap between the property poor and property wealthy districts in providing educational opportunities. The trial court found the present system to be in violation of

---

[2]Jim DuPree, et al; Clover Bend School District No. 12 of Lawrence County, individually and as a Representative of All School Districts Requiring Minimum Foundation Program Aid Funds to Provide their Students a Minimum Level of Education, Little Rock School District, North Little Rock School District.

[3]§ 3. Equality before the law. — The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition.

§ 2. Freedom and independence. — All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. To secure these rights the governments are instituted among men, deriving their just powers from the consent of the governed.

§ 18. Privileges and immunities — Equality. — The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.

[4]§ 1. Free school system. — Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education. The specific intention of this amendment is to authorize that in addition to existing constitutional or statutory provisions the General Assembly and/or public school districts may spend public funds for the education of persons over twenty-one (21) years of age and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it.

the constitutional provisions in question, which decision we affirm. We will first comment on the trial court's finding and then address the points raised on appeal.

The funding for Arkansas schools comes from three sources: state revenues provide 51.6%, local revenues 38.1%, and federal revenues 10.3%. The majority of state aid is distributed under the Minimum Foundation Program (MFP). In 1978-79 MFP constituted 77.1% of all state aid. Act 1100 of 1979, the current MFP program, is similar to prior MFP programs and consists of two major elements: base aid and equalization aid. The base aid program originated under the Minimum School Budget Law of 1951. The formula was based on a calculation of teacher and student population per district. The base aid program contained a "hold-harmless" provision which guaranteed that no district would receive less aid in any year than it received the previous year. As a result, a district with declining enrollment would over the years get continually higher aid per pupil. While Act 1100 eliminates the district "hold-harmless" provision, it still contains a pupil "hold-harmless" provision which has no bearing on educational needs or property wealth; the base aid year is permanently held at the 1978-79 level, and the inequities resuting from thirty years of the district "hold-harmless" provision are being carried forward without compensating adjustments.

The funds remaining after allocation for base aid are distributed under "equalization aid". Under this section of the act, *half* of the remaining funds are distributed under a flat grant on a per pupil basis. Districts receive the same amount of aid under this provision irrespective of local property wealth and revenue raised. The remaining funds under the equalization provision are then distributed under a formula directed at equalizing the disparity between the poor and wealthy districts. Of the total allocated under this program in 1979-80, this accounted for only 6.8% of MFP aid.

The other area of contention is the distribution of funds for vocational education. In order for a school district to institute a program of vocational education approved for

state funding, it must first establish a program with local funds. The state will consider funding a portion of the program only if the program is already operational. Obviously, this requirement works to the advantage of the wealthier school districts which can raise the funds and to the disadvantage of the poorer districts which lack the resources for such programs.

Against this backdrop of funding is the undisputed evidence that there are sharp disparities among school districts in the expenditures per pupil and the education opportunities available as reflected by staff, class size, curriculum, remedial services, facilities, materials and equipment. In dollar terms the highest and lowest revenues per pupil in 1978-79 respectively were $2,378 and $873. Disregarding the extremes, the difference at the 95th and 5th percentiles was $1,576 and $937. It is also undisputed that there is a substantial variation in property wealth among districts. The distribution of property wealth, measured as equalized assessed valuation per pupil in average daily attendance (ADA) in 1978-79, ranged from $73,773 to $1,853. These wealth disparities are prevalent among both large and small districts. As the system is currently operating, the major determinative of local revenues is district property wealth and the amount a school district can raise is directly related to its property wealth.

The range in revenues among school districts in Arkansas is not limited to the extremes. There are a substantial number of children affected by the revenue disparities. In 1978-79, only 7% of the pupils resided in school districts with over $1,500 per pupil in state-local revenues, while over 21% resided in districts with less than $1000 in state-local revenues, and 55% of the districts were below the state mean. This great disparity among the districts' property wealth and the current state funding system as it is now applied does not equalize the educational revenues available to the school districts, but only widens the gap.

The appellants devote little attention to the constitutional provisions in question, but contend that there is no requirement of uniformity of educational opportunities

throughout the state, that the constitution only requires that all children receive a "general, suitable and efficient" education. Appellants point to cases from other jurisdictions finding no violation of equal protection clauses under similar funding systems, decisions based primarily on the legitimate state interest of promoting local control. See *Board of Education* v. *Nyquist,* 453 N.Y.S.2d 643 (1982); *McDaniel* v. *Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981). The arguments are not persuasive.

Most cases finding similar state financing systems unconstitutional have found their state's equal protection clause to be applicable and to require equal educational opportunities. See *Washakie County School District No. One* v. *Herschler,* 606 P.2d 310 (Wyo. 1980); *Pauley* v. *Kelly,* 255 S.E.2d 859 (W. Va. 1979); *Serrano* v. *Priest,* 557 P.2d 929 (Cal. 1976); *Horton* v. *Meskill,* 376 A.2d 359 (Conn. 1976). In at least one jurisdiction, the court found its constitution demanded an equal education opportunity based solely on an education clause similar to ours. *Robinson* v. *Cahill,* 303 A.2d 273 (N.J. 1973).

There is no sound basis for holding the equal protection clause inapplicable to the facts in this case. The constitutional mandate for a general, suitable and efficient education in no way precludes us from applying the equal protection clause to the present financing system, in fact under the interpretations of such cases as *Robinson, supra,* that clause only reinforces the decision that the equal protection clause applies.

We can find no legitimate state purpose to support the system. It bears no rational relationship to the educational needs of the individual districts, rather it is determined primarily by the tax base of each district. The trial court found the educational opportunity of the children in this state should not be controlled by the forfuitous circumstance of residence, and we concur in that view. Such a system only promotes greater opportunities for the advantaged while diminishing the opportunities for the disadvantaged.

Those jurisdictions finding no equal protection viola-

tion in a system based on district wealth generally uphold the system of funding by finding a legitimate state purpose in maintaining local control. We find, however, two fallacies in this reasoning. First, to alter the state financing system to provide greater equalization among districts does not in any way dictate that local control must be reduced. Second, as pointed out in *Serrano, supra,* at 948, "The notion of local control was a 'cruel illusion' for the poor districts due to limitations placed upon them by the system itself. . . . Far from being necessary to promote local fiscal choice, the present system actually deprives the less wealthy districts of the option." Consequently, even without deciding whether the right to a public education is fundamental, we can find no constitutional basis for the present system, as it has no rational bearing on the educational needs of the district.

We come to this conclusion in part because we believe the right to equal educational opportunity is basic to our society. "It is the very essence and foundation of a civilized culture; it is the cohesive element that binds the fabric of our society together." *Horton* at 377, Bogdanski, J. conc. Education becomes the essential prerequisite that allows our citizens to be able to appreciate, claim and effectively realize their established rights. The opening phrase to our constitutional mandate for a public school system underscores the truth of the principle.

> Intelligence and virtue being the safeguards of liberty and bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools . . . (Art. 14 § 1)

The appellants' arguments are wide of the mark in this case. They concede the disparities that exist among the school districts, but they offer no legitimate state purpose to support it. Rather, their attack comes from an oblique standpoint. They assert that the constitution only requires a suitable, effective education and that the appellees have failed to prove that is not true in their districts. The evidence offered may have shown that the appellee districts offered the bare rudiments of educational opportunities, but we are

in genuine doubt that they were proved to be suitable and efficient. However, even were the complaining districts shown to meet the bare requirements of educational offerings, that is not what the constitution demands. For some districts to supply the barest necessities and others to have programs generously endowed does not meet the requirements of the constitution. Bare and minimal sufficiency does not translate into equal educational opportunity. "Equal protection is not addressed to minimal sufficiency but rather to the unjustifiable inequalities of state action." *San Antonio School District* v. *Rodriquez,* 411 U.S. 1, 70 (1972). Marshall, J., dissenting.

Appellants also submit that the reason appellees are lacking in funds is not that they are property poor but that they under assessed. The individual school districts, however, have only limited control over the assessment procedure. The assessment is done on a county wide basis and all school boards in the county are represented on the county equalization boards as a minority. Appellants' argument is additionally weakened by the evidence presented that *all* counties are presently under assessed and that there are instances where appellee and appellant districts are in the same county and consequently are subject to the same assessment practices.

Appellants contend that once the appellee districts are properly assessed at the mandated level (per *Public Service Commission* v. *Pulaski County Equalization Board,* 266 Ark. 64, 582 S.W.2d 942 [1979]) they will have sufficient revenues to provide a suitable education. However, the trial court found otherwise and the evidence does not convince us to the contrary. Too, it misses the main issue. When all counties are assessed at the proper level, the gap will still exist between the poor and wealthy districts and the mandate of the constitution will remain unfulfilled. The appellants' amicus brief presents a similar point, arguing that the trial court's ruling was premature and a decision should be deferred until reassessment is completed. This argument ignores the trial court's findings, which we find convincing, that reassessment will not improve the plight of the property poor districts. The argument also ignores the fact that

regardless of the result of reassessment, the fatal flaw in the distribution method under the present system would still exist.

Appellants point out that the appellee districts are not voting the same level of millage as the appellant districts. The record shows otherwise, however, and the average millage of the appellee districts is equal to and in some cases higher than that of the appellant districts. Appellants contend that the income level of appellee districts is higher and they would need to raise their millage level considerably to put them at the same "pain threshold" as that of the appellant districts. Appellants also point to Amendment 40[5] of the constitution which they claim requires all districts to levy taxes for needed funds before the district can request additional aid from the state. The appellees, they claim, have not first met this burden.

Appellants' claim that the complaining districts are all of higher income levels is unsustained except for general allegations and unsupported by any statistical proof. We

---

[5]No. 40, Article 14 § 3, Amendment No. 11 Amended. § 1. Poll tax —School district tax — Budget — Approval of tax rate by electors. — The General Assembly shall provide for the support of common schools by general law, including an annual per capita tax of one dollar, to be assessed on every male inhabitant of this State over the age of twenty-one years; and school districts are hereby authorized to levy by a vote of the qualified electors respectively thereof an annual tax for the maintenance of schools, the erection and equipment of school buildings and the retirement of existing indebtedness, the amount of such tax to be determined in the following manner:

The Board of Directors of each school district shall prepare, approve and make public not less than sixty (60) days in advance of the annual school election a proposed budget of expenditures deemed necessary to provide for the foregoing purposes, together with a rate of tax levy sufficient to provide the funds therefor, including the rate under any continuing levy for the retirement of indebtedness. If a majority of the qualified voters in said school district voting in the annual school election shall approve the rate of tax so proposed by the Board of Directors, then the tax at the rate so approved shall be collected as provided by law. In the event a majority of said qualified electors voting in said annual school election shall disapprove the proposed rate of tax, then the tax shall be collected at the rate approved in the last preceding annual school election.

Provided, that no such tax shall be appropriated for any other purpose nor to any other district than that for which it is levied.

would also have to assume that this was the case with *all* property poor districts throughout the state and such speculation has no place in this issue. The same argument was addressed in *Serrano, supra.* That court responded that the constitutional provision that "specifically authorizes local districts to levy school taxes, in no way implies that that section authorizes a system in violation of the requirements of equal protection." *Serrano* at 955. We find that reasoning disposes of the issue.

We have discussed the two major problems faced in financing our state's educational system. The first is the obvious disparity in property wealth among districts. That wealth is what primarily dictates the amount of revenue each district receives and the quality of education in that district. The second problem is the manner in which the state determines how the state funds are distributed, and as we have said, the current system is not a rational one. The end result is a violation of the mandates of our constitution. Ultimately, the responsibility for maintaining a general, suitable and efficient school system falls upon the state. "Whether the state acts directly or imposes the role upon the local government, the end product must be what the constitution commands. [When a district falls short of the constitutional requirements], whatever the reasons for the violation, the obligation is the state's to rectify it. If local government fails, the state government must compel it to act, and if the local government cannot carry the burden, the state must itself meet its continuing obligation." *Robinson, supra,* at 295 and cited with approval in *Pauley, supra* at 873. *Serrano* in addressing the same problem notes also the limits of judicial interpretation on this issue. The comments are worth repeating:

> The dispositive answer to the above arguments is simply that this court is not now engaged in — nor is it about to undertake — the "search for tax equity" which defendants prefigure. As defendants themselves recognize, it is the Legislature which by virtue of institutional competency as well as constitutional function is assigned that difficult and perilous quest. Our task is much more narrowly defined: it is to determine whether

the trial court committed prejudicial legal error in determining whether the state school financing system at issue before it was violative of our state constitutional provisions guaranteeing equal protection of the laws insofar as it denies equal educational opportunity to the public school students of this state. If we determine that no such error occurred, we must affirm the trial court's judgment, leaving the matter of achieving a constitutional system to the body equipped and designed to perform that function. *Serrano* at 946.

The trial judge was assigned specially to this case. He heard thirty-nine witnesses and reviewed 287 exhibits resulting in over 7400 pages of transcript. His conclusions of fact and law were extensive and detailed, and obvious time and study went into the final decision. We will not overturn the decision below unless we find it clearly erroneous. (ARCP 52). After our own review of the trial court's findings, the arguments presented by both sides and the decisions of other jurisdictions, we conclude that the findings are not clearly erroneous and, accordingly, the decree is affirmed.

Appellees' motion to tax costs against appellants pursuant to Rule 9 (e) is denied. We concede the abstract is abbreviated, to say the least, but this is an exceptional case, involving issues and concepts of the broadest possible scope, and we are satisfied appellants have made a good faith effort to give an adequate, if concise, abridgement of the record.

ADKISSON, C.J., dissents.

HICKMAN and PURTLE, JJ., concur.

DUDLEY, J., concurs to the extent that the majority opinion finds a violation of Article XIV, § 1 of the Arkansas Constitution.

DARRELL HICKMAN, Justice, concurring. I wholeheartedly agree with the majority. I concur only to add some thoughts that ought to be expressed. This is a case which we could have easily decided the other way with good legal justification. But there are equally good legal reasons for our

decision. In addition the subject matter almost compels us to act because public education is one of the most important services provided by state government. Education is too important a right or privilege for any authority in state government to ignore when it is in dangerous straits and the legal means exist to address the problem. We have before us a problem that the other branches of government have either been unable or unwilling to resolve and part of the answer lies easily within the realm of our authority. Their failure to act is understandable in view of the complexity of the problem and the pressure that comes to bear on the largest expenditure of state funds.

A disparity exists in the dispensation of state funds to local school districts that cannot be justified by any solid constitutional principle. Equality is always the rule in constitutiona law, not the exception, and it is a principle repeatedly contained in our Constitution, specifically in the equal protection clause, ARK. CONST, art. 2 § 3; the privileges and immunities clause, ARK. CONST. art. 2 § 18; and even in ARK. CONST. amend. XIV, which prohibits local and special legislation.

Equality is, of course, mostly an ideal or goal, and hardly ever a reality in government. Reasons are always given for not requiring equality but they are usually no more than excuses, and I do not hesitate to point out that if the Arkansas legislature approaches its new task with anything less than the goal of equality in dispensing state funds, it risks repeating the same mistakes that brought about this situation. To be specific, I cannot justify, on this record, any formula of distribution except on a per pupil basis. If there are not enough funds, using such a formula, to insure each student a decent educational opportunity, then the answer lies elsewhere and not in the unequal distribution of funds.

The large and small districts alike argue that it takes more money to provide an education because of their size. I am very doubtful that is the case for larger districts, and the small districts may find the answer to their problem lies in consolidation or merger. Small districts may have to concede

that they cannot continue to provide a suitable education for their students under such a formula. The large districts have three alternatives: Either change the composition of their district, seek extra funds locally, or more aid for all schools. I do not say any formula, except one based on a per pupil basis, would fail legal examiation; but it would certainly have a more difficult time surviving legal scrutiny. The evidence to justify any distribution, other than a per pupil basis, should be both clear and convincing.

There is no doubt in my judgment that the formula must take into consideration the value of local property available for taxes. I think the majority has said this, but it needs to be made plain, that the disparity that exists, exists partly because of the difference in local taxes that are available. To be specific, a school district that is fortunate enough to have a nuclear energy plant in its district has more tax dollars available than a rural school district that has no taxable local industry. But the children of each district should have the same educational opportunity. That means the wealthier district cannot receive the same state aid the poor district does. A proper formula will consider this disparity. While the state-wide assessment we ordered in *Arkansas Public Service Commission* v. *Pulaski County Board of Equalization*, 266 Ark. 64, 582 S.W.2d 942 (1979), will not cure all the inequities that exist, it will certainly provide a basis for addressing the problem. Furthermore, those counties that refuse in the future to properly and lawfully assess their taxable property should be legally accountable to the school districts located in counties that do conscientiously assess property, because it is common knowledge some counties simply refuse or neglect to properly assess property.

We have only the question of the state money before us, but the problem has many facets and the peripheral and collateral questions are staggering. They cannot be ignored by us or the legislature in addressing the question. Local school districts cannot assume their borders will or should remain static forever. Consolidation or merger, or even reducing the size of a district should not be unthinkable.

The legislature will have the same difficulties in setting a new formula as it has had in dealing with the one rejected. Some school districts will want special consideration, whether they are small, medium, large, from an urban or rural area. If the funds are distributed equally, some districts may lose funds. This immediately raises the question of what kind of education should be provided. The appellants point to The Quality Education Act of 1969 (Ark. Stat. Ann. §§ 80-4601 — 4615) which is supposed to insure that the children of Arkansas receive a quality education. The Act is, of course, meaningless so far as quality is concerned. Any school district that can only comply with that Act is probably not offering its students a decent education opportunity as required by ARK. CONST. art. 14, § 1. The Act was probably passed so that small districts would not have to consolidate. In addition to the problems and questions to be resolved, if these were not enough, there looms in the shadows ARK. CONST. amend. 59 passed in 1980. It deprived school districts of valuably needed tax dollars by granting specific tax favors to certain property owners and freezing to an extent tax revenue. Its validity has never been challenged in court.

It is my respectful judgment that this court had no intention of intervening in a legislative or executive matter. Nor do we intend to supervise their work and if the General Assembly takes this opportunity to correct years of habit and starts afresh providing a truly equal formula for dispensing state aid, then there will be no need for this court to speak on this matter again. We are not a wealthy state but we have the means to provide to every student, both at the secondary and higher level, a decent opportunity for an education. But our assets cannot be squandered by political decisions or unnecessary compromise.

JOHN I. PURTLE, Justice, concurring. I concur with the majority with the exception that I insist that the right to a free public education is fundamental. Article 14, sec. 1 of the Arkansas Constitution of 1874 clearly mandates the state to provide a free school system to safeguard liberty and provide a bulwark for free and good government. Not to hold that such an education is fundamental is to chip away at the

underlying foundation and, indeed, the cornerstone of our present democratic way of life.

It further seems to me we ought to suggest some type of alternate plan to the one which has been struck down. One simple solution would be to require each district to levy and collect a certain millage on all property assessed at 20% of market value. The state would then distribute its money on a per capita basis, taking into consideration certain weighted allowances for special situations such as a handicapped program, to be applied to all districts alike.

RICHARD B. ADKISSON, Chief Justice, dissenting. The majority point to the fact that there is a great disparity in property wealth among the districts as being part of the problem with our school financing, but it is undisputed that Amendment 40 contemplates that school financing will be on a local level. The implication of the majority opinion is that our law, Ark. Stat. Ann. § 80-401 (Repl. 1980) and following, which allows the incorporation of certain property rich school districts to the exclusion of other property poor districts is unconstitutional. Although at this time there may be a disparity in wealth among districts, it is not known to what extent that disparity will exist after the state has completed the court mandated reassessment as per *Public Service Commission* v. *Pulaski County Equalization Board*, 266 Ark. 64, 582 S.W.2d 942 (1979). Once reassessment is complete, the disparity may not be so great as the majority indicates. For that reason, I would not make a premature decision of such magnitude until all the facts necessary to the decision are established.

Moreover, it is worth noting that of the thirteen courts that have reviewed state school financing systems similar to ours, only four have found such systems to be unconstitutional. *Washakie Co. School Dist. No. One* v. *Herschler*, 606 P.2d 310 (Wyo. 1980); *Serrano* v. *Priest*, 135 Cal. Rptr. 345, 557 P.2d 929 (1977); *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977); *Milliken* v. *Green*, 389 Mich. 1, 203 N.W.2d 457 (1972). The weight of authority clearly points toward upholding our system. *San Antonio Independent Sch. Dist.*

v. *Rodriquez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L.Ed.2d 16, reh'g denied, 411 U.S. 959, 93 S. Ct. 1919, 36 L.Ed.2d 418 (1973); *Lujan* v. *Colorado State Bd. of Educ.,* 649 P.2d 1005 (Colo. 1982); *Bd. of Educ. of City Sch. Dist., etc.* v. *Walter,* 58 Ohio St.2d 368, 390 N.E.2d 813 (1979); *McDaniel* v. *Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Olsen* v. *State,* 276 Or. 9, 554 P.2d 139 (1976); *Thompson* v. *Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Northshore Sch. Dist. No. 417* v. *Kinnear,* 84 Wash.2d 685, 530 P.2d 178 (1974); *Shofstall* v. *Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973).