William Randolph HEITMAN,

v.

The STATE of Texas.

No. 1380–89.

Court of Criminal Appeals of Texas, En Banc.

June 26, 1991.

Rehearing Denied Sept. 18, 1991.

Robert M. Rose, John H. Hagler, Dallas, for appellant.

John Vance, Dist. Atty., and Sharon Batjer, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

The trial court convicted appellant on his plea of nolo contendere to the offense of possession of methamphetamine with intent to deliver, and he appealed to contest the court's adverse ruling on his motion to suppress the methamphetamine which was discovered during an inventory search of his car. Art. 44.02. V.A.C.C.P. The Court of Appeals affirmed. *Heitman v. State,* 776 S.W.2d 324 (Tex.App.—Fort Worth 1989). A detailed rendition of the pertinent facts is set out in the Court of Appeals opinion. Briefly, police discovered the appellant slumped forward in his car outside a store at about 5:30 a.m. Officers found a loaded 9mm pistol on appellant and arrested him for UCW. As appellant was transported to jail, the officers inventoried his car and found a locked briefcase in the passenger compartment. The officers "jimmied" open the briefcase and found the methamphetamine. Appellant claims the inventory search violated both the Fourth Amendment and Art. I, § 9. We granted appellant's petition for discretionary review to determine whether either claim has merit.

Without commenting on the correctness of the result reached in the Court of Appeals disposition of the Fourth Amendment claim, we note that cursory treatment was given to the Art. I, § 9 claim. Guided by language in some caselaw and distinguishing language in other caselaw, all from this Court, the Court of Appeals disposed of the Art. I § 9 claim solely by construing it in harmony with the Fourth Amendment. Today we reserve for ourselves the power to interpret our own constitution. We will reverse the decision of the Court of Appeals and remand the case to them for an independent analysis of the state constitutional claim.

We herein confront the question of whether this Court will automatically adopt and apply to Art. I, § 9, of the Texas Constitution the Supreme Court's interpretations of the Fourth Amendment. This Court has repeatedly recognized that Art. I, § 9 of the Texas Constitution and the Fourth Amendment to the United States Constitution are the same in all material aspects. *Gordon v. State,* 801 S.W.2d 899 (Tex.Cr.App.1990) (plurality); *Johnson v. State,* 803 S.W.2d 272 (Tex.Cr.App.1990): *Bower v. State,* 769 S.W.2d 887 (Tex.Cr. App.1989) (plurality), *cert. denied* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611; *Eisenhauer v. State,* 754 S.W.2d 159 (Tex.Cr. App.1988) (plurality); *Brown v. State,* 657 S.W.2d 797 (Tex.Cr.App.1983) (Opinion on Remand from the United States Supreme Court); and *Crowell v. State,* 147 Tex. Cr.R. 299, 180 S.W.2d 343 (1944). The two provisions serve to safeguard individuals' privacy and security against arbitrary invasion by governmental officials. *Evers v. State,* 576 S.W.2d 46 (Tex.Cr.App.1979), and *Kolb v. State,* 532 S.W.2d 87 (Tex.Cr. App.1976).

Under our system of federalism, however, the states are free to reject federal holdings as long as state action does not fall below the minimum standards provided by federal constitutional protections. See *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). Likewise, a

state is free as a matter of its own law to impose greater restrictions on police activity than those the Supreme Court holds to be necessary upon federal constitutional standards. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). Although recognizing these precepts of federalism, see *e.g. Brown v. State,* 657 S.W.2d 797, 799 (Tex.Cr.App.1983) (Opinion on Remand from the United States Supreme Court); *Gillett v. State,* 588 S.W.2d 361, 367 (Tex.Cr.App.1979) (Roberts, J., dissenting), this Court has not chosen to interpret Art. I, § 9 in a manner that accords the citizens of this State greater protections than those accorded by the Fourth Amendment.[1] We write today to finally resolve this question of interpretation of our state constitution, and we first review the prior decisions of this Court on this issue.

*Crowell,* 180 S.W.2d 343, is one of the earliest cases from this Court to note the textual similarity between Art. I, § 9, and the Fourth Amendment.[2] The appellant in *Crowell* challenged the legality of a search of his residence on both state and federal constitutional grounds. The Court first addressed the federal constitutional provision and after reviewing three Supreme Court cases, the Court held the appellant's Fourth Amendment rights were not violated. As to the state constitutional issue the Court merely stated it "sustain[ed] the same conclusion under Art. I, Sec. 9 of our State Constitution" and cited four prior Texas cases as authority. *Stach v. State,* 97 Tex.Cr.R. 280, 260 S.W. 569 (1924); *Eversole v. State,* 106 Tex.Cr.R. 567, 294 S.W. 210 (1927); *Hunter v. State,* 111 Tex.Cr.R. 252, 12 S.W.2d 566 (1928); and *Taylor v. State,* 120 Tex.Cr.R. 268, 49 S.W.2d 459 (1932). None of these cases held Art. I, § 9, was to be interpreted in conformance with the Supreme Court's interpretations of the Fourth Amendment. Thus the apparent seminal case with this holding, *Crowell,* is based neither on stare decisis nor legal reasoning (save the observation concerning similarity of wording).

In *Evers v. State,* 576 S.W.2d 46 (Tex.Cr.App.1978) (panel opinion), an inventory search case, the appellant challenged the police inventory of his car under both the federal and state constitutions. This Court noted in footnote 1, *id.* at 48, that the Texas and United States Constitutions both served the same purpose of protecting individuals against arbitrary government invasion. The Court discussed inventory searches in the context of *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), without further reference to the Texas Constitution. By implication, the Court treated inventory law in Texas consistently with the protections afforded that subject under federal law.

In *Gill v. State,* 625 S.W.2d 307, 318–19 (Tex.Cr.App.1981) (opinion on State's motion for rehearing) (overruled in part, *Osban v. State,* 726 S.W.2d 107 (Tex.Cr.App. 1986)), the Court again referred to the Texas Constitution: "In short, the expression, 'inventory search,' is not a talisman in whose presence the Fourth Amendment or Art. I, Sec. 9, of the Texas Constitution fades away and disappears." We concluded that the inventory search of a locked trunk was improper under both the Texas and United States Constitutions but did not expressly conclude that the Texas Constitution would be interpreted in accordance with the United States Constitution.

In *Brown,* 657 S.W.2d 797, this Court was squarely presented with the issue that confronts us now. Quoting *Crowell,* 180

---

1. The Texas legislature and the voters have exercised this freedom to afford the state's citizens greater protections than the minimum requirements of the federal constitution. See e.g. Art. I, § 10, Tex. Const., (requiring indictment by grand jury in felonies although states are not subject to the indictment requirement of the Fifth Amendment; *Whisenant v. State,* 557 S.W.2d 102 (Tex.Cr.App.1977) (Texas procedure for revoking probations affords greater protection than that required by Fourteenth Amend-

ment); and *Butler v. State,* 493 S.W.2d 190 (Tex. Cr.App.1973) (Art. 38.22, V.A.C.C.P., more strict than Fifth Amendment regarding oral confessions).

2. In a single paragraph, the Court states:

Art. I, Sec. 9, of the Constitution of this State, and the 4th Amendment to the Federal Constitution are, in all material aspects, the same. *Crowell,* 180 S.W.2d at 346.

S.W.2d at 346, this Court noted Art. I, § 9, and the Fourth Amendment were "in all material aspects, the same" and implicitly found the two provisions protected the same interests. Thus, the Court "decline[d appellant's] invitation to attach to Article I, Section 9 of our Texas Constitution a more restrictive standard of protection than that provided by the Fourth Amendment," *Brown*, 657 S.W.2d at 798, even though the Court recognized it was free to do so, see *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and that the State had established, in the past, stricter, more protective provisions.[3] This decision in *Brown*, however, did not garner a majority vote from this Court. Judge Odom only concurred in the result, while then Presiding Judge Onion and Judge Miller joined Judge Clinton's concurring opinion which only joined the judgment of the court. Judge Clinton opined that by gratuitously saying this Court would interpret our state constitution "in harmony with constructions placed on the Fourth Amendment by the Supreme Court of the United States, ... the citizens of this State [are deprived] of protections against invasion of privacy reasonably flowing from Article I, § 9, and other guarantees in our own Bill of Rights." *Brown*, 657 S.W.2d at 800 (Clinton, J. concurring). Judge Teague dissented to the plurality's "implicit holding that the members of this Court now have the role of being nothing more than mimicking court jesters of the Supreme Court of the United States ..." *Id.* at 810 (Teague, J. dissenting).

In spite of this language in *Brown*, the Court again *implied* in *Ward v. State*, 659 S.W.2d 643 (Tex.Cr.App.1983), but did not expressly hold, that our state constitution would be interpreted in harmony with comparable federal provisions. Here, the ap-

pellant challenged an inventory search under both the Texas and United States Constitutions. After this Court considered the facts, we held that the inventory search was authorized under *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, and did not a violate either the United States or Texas Constitutions.[4]

It appeared the "interpretation issue" was resolved by this Court in *Osban v. State*, 726 S.W.2d 107 (Tex.Cr.App.1986), wherein a majority of this Court finally accepted the language from the plurality opinion in *Brown*, 657 S.W.2d at 799, by stating:

> ... [T]his Court has opted to interpret our Constitution in harmony with the Supreme Court's opinion interpreting the Fourth Amendment. We shall continue on this path until such time as we are statutorily or constitutionally mandated to do otherwise.

*Osban*, 726 S.W.2d at 111. This Court, however, then retreated from this position in *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Cr.App.1988), wherein the majority adopted the totality of the circumstances test from *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), for probable cause determinations pursuant to Art. 18.01, V.A.C.C.P., and Art. 1, § 9. The author of the majority opinion, now Presiding Judge McCormick, wrote the "opinion [was] made to stay in step with the federal constitutional model for probable cause determinations." *Eisenhauer*, 754 S.W.2d at 164. A majority of this Court, however, did not agree with this aspect of the decision. In his concurring opinion, Judge Duncan objected to this comment that the decision was made in order "to stay in step with the federal constitutional model for probable cause de-

---

3. As an example the Court stated that Texas provided for a statutory exclusionary rule, Art. 38.23, V.A.C.C.P., and its predecessor, well in advance of the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

4. See also *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr.App.1984), wherein the appellant successfully challenged the inventory search of his car. The record was devoid of any evidence

that the police were actually engaged in a caretaking function when they searched the appellant's truck. Although this Court discussed both federal and state caselaw on the issue, the Court merely concluded the evidence was "unconstitutionally obtained" without specifically citing either constitution. Again, the implication is that the protections accorded under both constitutions are the same.

terminations." *Eisenhauer*, 754 S.W.2d at 166 (Duncan, J. concurring). Judge Duncan correctly noted there was nothing compelling this Court to interpret state constitutional rights in harmony with the federal equivalents and that "there is nothing inherently improper in state court opinion diverging from Supreme Court authority on the very simple basis that there is a viable disagreement on the matter of interpretation." [5] *Id.* Judges Miller and Campbell joined this opinion. Moreover, in his well-written and thoroughly researched dissenting opinion, Judge Clinton, joined by Judge Teague who also wrote a dissenting opinion, vigorously objected to this notion that this Court must "stay in step" with the Supreme Court in clear disregard of the federalism concept. Thus, through their concurring and dissenting opinions, five judges on this Court clearly explicated they were not willing to march lock-step with federal court interpretations of constitutional rights.[6]

In *Osban*, 726 S.W.2d at 111, quoting *Brown*, 657 S.W.2d at 799, this Court stated we will interpret our Constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment until "statutorily or constitutionally mandated to do otherwise." We find, however, that there are several reasons and situations other than similarity of wording or absence of statutory or constitutional mandates which justify, if not compel, a state court to independently judicially interpret its own state constitutional provisions.

Initially, using similarity of wording as the foundation for the theory of harmonious interpretation assumes that state constitutional framers desired that this be done. We believe this assumption to be erroneous. There is no historical factual basis for such an assumption. A recent law review article points out that as early as 1855, several state appellate courts had already looked to their own state constitutional conventions in interpreting the provisions of their constitutions. Although some states used the federal constitution as a guideline for their own, arguably the framers of the states' constitutions were unaware of the original intent of the framers of the federal constitution when it was drafted. Thus, even under an original intent theory, looking to federal constitutional jurisprudence in interpreting state constitutional provisions was not necessarily prudent. In fact the article's author noted the historical debate regarding just such a practice and labeled it ludicrous to believe " 'that the opinions and constructions of those persons who had framed and proposed the [federal] Constitution, opinions given in private, constructions unknown to the people when they adopted the instrument, should, ..., be appealed to, in order to countenance the doctrine of some gentlemen ...' ". See generally Baade, *"Original Intent" in Historical Perspective: Some Critical Glosses*, 69 Texas L.Rev. 1001 (1991), at p. 1018, 1055.

---

**5.** One example of this disagreement of interpretation is *Dunn v. State,* 696 S.W.2d 561 (Tex.Cr. App.1985), which Judge Duncan discussed in his article on federalism. See Duncan, *Terminating the Guardianship: A New Role for State Courts,* 19 St. Mary's L.J. 809 (1988). In *Dunn,* this Court addressed police misconduct resulting in a confession and the right to counsel. Addressing these concerns under the Fifth Amendment, the Court held Dunn had voluntarily but not knowingly and intelligently waived his right to counsel. The Court noted in its opinion that this very same issue was pending in the United States Supreme Court (the case of *Moran v. Burbine,* see fn. *infra* ) but addressed the issue anyway. The resulting decision in *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), was to the contrary, finding a valid waiver and that the resulting confession need not be suppressed. Furthermore, in *Dunn,* this

Court held, without independent analysis, that the corresponding provisions of the Texas Constitution were also violated.

**6.** See also footnote 6 in *Bower v. State,* 769 S.W.2d 887 (Tex.Cr.App.1989), relying on *Brown,* 657 S.W.2d at 798, and stating this Court continues to interpret the Texas Constitution in harmony with the Supreme Court opinions interpreting the Fourth Amendment; *Johnson,* 803 S.W.2d at 288, citing *Eisenhauer,* for proposition that this Court *held* Art. I, § 9, and the Fourth Amendment are "in all material aspects the same"; and *Gordon,* 801 S.W.2d at 912, in dicta stating, given the pronouncements in *Eisenhauer,* there is no reason why this Court should attempt to provide a more restrictive standard under Art. I, § 9, than is required by the Fourth and Fourteenth Amendments.

Historically, criminal procedure was primarily governed by state constitutions and by each state's judicial interpretation of its own statutory and constitutional provisions. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Tex.L.Rev. 1141, 1144 (1985). Until the passage of the Fourteenth Amendment and its selective incorporation, only state judiciaries relying on state constitutions protected individual rights from state governments. *LeCroy v. Hanlon*, 713 S.W.2d 335, 338, n. 3 (Tex. 1986). Thus, state courts and state constitutions originally were the primary guarantors of individual rights and of liberty in criminal cases. *LeCroy v. Hanlon*, 713 S.W.2d at 338 n. 3, citing Linde, *First Things First: Rediscovering the States' Bill of Rights*, 9 U.Balt.L.Rev. 379, 380–83 (1980), and Comment, *Rediscovering State Constitutions for Individual Rights Protection*, 37 Baylor L.Rev. 463, 474–75 (1985); and Abrahamson, *supra* at 1144. State courts have thus been considered "laboratories" of constitutional law. State courts have the opportunity to experiment with constitutional rights and lay potential guidelines for future constitutional decisions of not only state courts but the Supreme Court as well. The United States Supreme Court has in fact looked to state constitutional jurisprudence and experience in determining to apply the federal Bill of Rights to the states. For example, in *Mapp v. Ohio*, 367 U.S. 643, 650, 81 S.Ct. 1684, 1689, 6 L.Ed.2d 1081 (1961), in discussing the exclusionary rule from *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court noted that although it had not imposed the rule upon the states as an essential ingredient of the Fourth Amendment, numerous states had. See *Wolf v. Colorado*, 338 U.S. 25, 27–29, 69 S.Ct. 1359, 1361–62, 93 L.Ed. 1782 (1949) (Court refuses to enforce exclusionary doctrine against states partly because other means of protection available and states' contrariety of views on adoption of rule). In 1949, prior to the *Wolf* decision, almost two-thirds of the states were opposed to using the exclusionary rule, while in 1961 more than half of the states which had addressed the exclusionary rule, either by legislative or judicial decision, had wholly or partly adopted or adhered to the *Weeks* rule. *Mapp v. Ohio*, 367 U.S. at 651, 81 S.Ct. at 1689. See *e.g.* fn. 4, *supra*. In reaching its decision that the exclusionary rule applied to the states via the Fourteenth Amendment, the Supreme Court discussed the experience the states had had with alternative means of protecting the Fourth Amendment right to privacy. Citing *People v. Cahan*, 44 Cal.2d 434, 282 P.2d 905, 911 (1955), the Supreme Court noted that California was compelled to follow the exclusionary rule because "other remedies [had] completely failed to secure compliance with the constitutional provisions ..." *Mapp v. Ohio*, 367 U.S. at 651, 81 S.Ct. at 1689. "The experience of California that such other remedies [had] been worthless and futile [was] buttressed by the experience of other states." *Id.* at 652, 81 S.Ct. at 1690. See e.g. also *Batson v. Kentucky*, 476 U.S. 79, 82 n. 1, 106 S.Ct. 1712, 1715 n. 1, 90 L.Ed.2d 69 (1986) (court notes some state courts, construing their own constitutions, accepted view that peremptory challenges used to strike Black jurors may violate Sixth Amendment; court also cites state and federal cases on this issue, thus showing the substantial disagreement on it in the courts); *Gideon v. Wainwright*, 372 U.S. 335, 338, 345, 83 S.Ct. 792, 793, 797, 9 L.Ed.2d 799 (1963) (court discusses defendant's federal right to counsel and controversy in state and federal courts regarding same); and *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1937) (citing state court decisions recognizing vital importance of liberty of the press).[7]

---

7. Abrahamson, *supra* at 1141–1143, notes that the Supreme Court justices have not always agreed on whether the state's laboratory should be more innovative, or less so, than the federal system. In Justice Powell's concurring opinion in *Johnson v. Louisiana*, 406 U.S. 366, 376–77, 92 S.Ct. 1635, 1641, 32 L.Ed.2d 162 (1972), he questioned the wisdom of rigidly applying federal standards to state jury procedures; Chief Justice Burger encouraged state experimentation in criminal procedure in *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1987) (Burger, C.J.,

Furthermore, the state courts are better able to approach state constitutional interpretation with a more innovative and responsive approach to local interests than the Supreme Court whose decisions bear the onus of nationwide applicability. The state court is best able to address the interests of the citizens of its state and balance those against the interests of that state as it does not have to operate from a national vision, seeking the lowest common denominator and considering all the variations from state to state.[8] For example, the South Dakota Supreme Court determines the reasonableness of a search and seizure by balancing the need for the search against the scope of the particular intrusion. *State v. Catlette*, 88 S.D. 406, 221 N.W.2d 25 (1974). The Florida Supreme Court, in addressing the constitutionality of a statute requiring parental consent before a minor may have an abortion, required the state to prove the statute furthered a "compelling state interest" through the least intrusive means. *In re T.W.*, 551 So.2d 1186, 1193 (Fla.1989).[9] The two compelling state interests implicated in this cause were the protection of the immature minor and the preservation of the family unit. The court held the statute unconstitutional because it was not the least intrusive means of furthering the state interests

because of its lack of procedural safeguards.

Riding in tandem with this idea that state courts can better respond to local interests is the concept of diversity. Our society is at once homogeneous and heterogenous, and our legal culture should correspondingly be homogenous (national) and heterogenous (state). Moreover, the very concept of federalism embraces such an approach. State courts may review and "rethink" federal constitutional decisions and thereby ensure that, when interpreting state constitutions, their citizens will have the "double security" the federal constitution was intended to provide.[10] In fact, over a century ago, the Supreme Court recognized the states' authority to depart from Supreme Court decisions. *Murdock v. City of Memphis*, 87 U.S. (20 Wall.) 590, 22 L.Ed. 429 (1875). There, the Supreme Court stated:

> [t]he State courts are the appropriate tribunals, as this court has repeatedly held, for the decision of questions arising under their local law, whether statutory or otherwise.

*Id.* at 626. Independent interpretation of state constitutional provisions is especially important since the Supreme Court began *not* finding independent and adequate state grounds for decisions so as to prevent

dissenting), but he criticized a state court's interpretation of its own law as requiring more protection for individual criminal defendants than the federal constitution as not being "rational law enforcement". *Florida v. Casal*, 462 U.S. 637, 639, 103 S.Ct. 3100, 3101, 77 L.Ed.2d 277 (1983) (Burger, C.J., concurring) (suppression of marihuana pursuant to state constitutional provision similar to Fourth Amendment).

**8.** The Supreme Court too engages in a balancing of interests, but it is done with a national perspective. That is, the Supreme Court must balance the Bill of Rights against the interests of the citizens of all states. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (governmental actions that substantially burden religious practice must be justified by a compelling governmental interest); *Sable Communications of California v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (government must have compelling government interest before regulating content of speech); *United States v. Villamonte-Marquez*, 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983) (balance intru-

sion on individual's Fourth Amendment interests against its promotion of legitimate governmental interests). This balancing is also done in instances other than the Bill of Rights. See e.g. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (state regulation of train lengths as safety measure obstructive to interstate commerce; state interest cannot be preserved at expense of national concern).

**9.** The court also stated that the Florida Constitution requires a "compelling" state interest in all cases where the state's right to privacy was implicated, as opposed to the federal constitution which allows intrusion based on a "significant" state interest. 551 So.2d at 1195.

**10.** According to Harrington, James C., *The Texas Bill of Rights*, Butterworth Legal Publishers, 1987, at p. 1, since 1970, state appellate courts around the country have decided more than 400 cases in which they have paid more deference to civil rights than has the United States Supreme Court.

states from expanding, not limiting, federally guaranteed rights.[11] Finally, failure to independently interpret the state constitution effectively repeals or renders moot the state constitutional provisions, and allows the Supreme Court, nine appointed justices who are not responsible to this state's electorate, to have the final say on our state constitutional rights.

Merely following Supreme Court decisions ignores state precedent that existed before the comparable federal right was applied to the states. For instance, two early cases, *Garcia v. State*, 151 Tex.Crim. 593, 210 S.W.2d 574, 580 (1948), and *Vasquez v. State*, 145 Tex.Crim. 376, 167 S.W.2d 1030, 1032 (1943), which were decided prior to the Supreme Court's decision in *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (Sixth Amendment right of confrontation applicable to states via Fourteenth Amendment), recognized a defendant's right of confrontation. *Garcia* and *Vasquez* were both cited in resolving the issue of the constitutionality of our child videotape statute in *Long v. State*, 742 S.W.2d 302 (Tex.Cr.App.1987), indicating that preexisting state law can assist in defining the scope of a state constitutional right that was only later recognized as a federally guaranteed right.[12] In that situation, reliance purely on federal decisions would ignore state court *stare decisis*. Other than these principled reasons for independent interpretation, there

may be statutory or constitutional mandates, as we have recognized.

Moreover, our state constitution is a doctrine independent of the federal constitution and its guarantees are not dependent upon those in the federal constitution.[13] The wording of our constitution is not identical to that of the federal constitution, although the rights and provisions are similar, and to interpret our state constitutional provisions in accordance with federal court interpretations of comparable rights ignores our own constitutional history. When the country known as the Republic of Texas became a state in 1846, it came into the Union with its own constitution. The statehood constitution of 1845, which had 21 rights guarantees under its Bill of Rights, "drew heavily on the newly-adopted constitution of Louisiana, and on the proposed constitution for the State of Texas drawn up in 1833, but, apparently, used the Constitution of 1836 as a working model as far as the general plan of government and the bill of rights were concerned." Vernon's Ann.Tex. Const., Preamble (Interpretive Commentary).[14] The 1876 Constitution, under which Texas operates today, had 29 Bill of Rights sections, and, in drafting this constitution, the authors relied on the wisdom of other states' constitutions.[15]

True, a reason to interpret a state right more broadly than a federal right may be that the state constitutional guarantee is cast in terms that allow a far broader interpretation than the corresponding federal constitutional protection [16]; thus, the state

---

**11.** Duncan, *Terminating the Guardianship: A New Role For State Courts,* 19 St. Mary's L.J. 809 (1988), at p. 834.

**12.** See Duncan, *id.* at 840.

**13.** Article I, section 1, of the Texas Constitution provides:
    Texas is a free and independent State, subject only to the Constitution of the United States, and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government, unimpaired to all the States.

**14.** The prior constitution, that of 1836, was a composite of the national constitution and the constitutions of various states, to-wit: Virginia, North Carolina, Pennsylvania, Massachusetts, Kentucky, Tennessee, Louisiana, Mississippi, Alabama, and Missouri. See Harrington, James

C., *The Texas Bill of Rights.* Butterworth Legal Publishers, 1987, at p. 17.

**15.** Harrington, *id.* at pp. 19–20. Our present constitution, however, now has 30 sections. The thirtieth, addressing victims' rights, was adopted by the voters of this state on November 7, 1989.

**16.** In *State v. Henry,* 302 Or. 510, 732 P.2d 9 (1987), the Oregon Supreme Court held obscene "speech, writing, and equivalent forms of communication are 'speech' nonetheless" and are entitled to protection from censorship under article I, section 8, of the Oregon Constitution. In reaching this conclusion, the Oregon court distinguished and analyzed the relevant language in the state and federal constitutions. The court found the language in its state's constitution was broader and covered any expressions of opinion.

may interpret its protections more broadly than federal protections.[17] Indeed, state Bill of Rights guarantees, on their face, are generally more expansive and solicitous of people's liberties than the federal Bill of Rights.[18] Numerous states have gone beyond the federal Supreme Court in recognizing additional rights for their citizens under their own state constitutions.[19] The Texas Supreme Court has recognized that the Texas Constitution's affirmative grant of free speech is more broadly worded than the First Amendment's proscription of Congress from abridging freedom of speech, *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988), although the court did not decide whether our free speech provision accorded greater protection than its federal counterpart. The court looked to one commentator's observations regarding the language of the Texas free speech right, to-wit:

> [V]arious states, like Texas, have broader free speech and assembly protections, which are often positively phrased as affirmative grants of rights rather than the simple restriction on government power observed in the first amendment to the federal constitution. These more expansive guarantees, which are within a state's 'sovereign right' as recognized by the federal Supreme Court, offer a significant distinction upon which courts rely to construe their state constitutions.

*Id.* at 402, quoting Harrington, *The Texas Bill of Rights,* at p. 40. In *Long,* 742 S.W.2d at 309, n. 9, Judge Duncan, writing for the majority, noted the syntactical difference between the confrontation clauses of the Sixth Amendment and our Art. I, § 10. The Texas constitutional provision "is easily susceptible to a more affirmative and vigorous interpretation" because its language "is arguably more emphatic" whereas the right of confrontation guaranteed under the Sixth Amendment is presented "in more or less a passive style". *Id.* Moreover, more than one state has concluded that even when the wording of the federal constitution is identical to the state constitution, the state has the power to give more protection to individual rights than provided by federal law. See *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 58 n. 6 (1974). See also *State v. Opperman,* 247 N.W.2d 673, 674 (S.D.1976) (Opinion on remand from United States Supreme Court), where the South Dakota state supreme court has "always assumed the independent nature of our state constitution regardless of any similarity between the language of that document and the federal constitution." The South Dakota court admitted the language of its constitutional provision was "almost identical" to that of the Fourth Amendment but exercised its "right to construe [the] state constitutional

---

**17.** In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court addressed deceptive police conduct resulting in a confession and the right to counsel in light of the Fifth Amendment. After finding no constitutional violation, the Court noted its opinion did not "disable[ ] the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Id.* at 428, 106 S.Ct. at 1145. Thus, in *People v. Houston,* 42 Cal.3d 595, 230 Cal.Rptr. 141, 724 P.2d 1166 (1986), the California Supreme Court did just that, declined to follow *Moran v. Burbine,* and relying solely on the California constitution, found the suspect's *Miranda* rights to counsel were violated. California has also construed its state constitutional free speech guarantee as broader and giving greater protection than the federal free speech guarantee. *Wilson v. Superior Court,* 13 Cal.3d 652, 119 Cal.Rptr. 468, 472, 532 P.2d 116, 120 (1975). Likewise, the Florida Supreme Court, in *Haliburton v. State,* 514 So.2d 1088 (Fla.1987), declined to follow *Moran v. Burbine* and held that police

conduct preventing an attorney from seeing his client is unacceptable and that the defendant's confession should be suppressed. The court found a violation of due process under article I, section 9, of the Florida Constitution. The court did not address the right to counsel issue.

**18.** See Harrington, James C., *The Texas Bill of Rights,* Butterworth Legal Publishers, 1987, at p. 7.

**19.** See e.g. *In re T.W.,* 551 So.2d 1186 (Fla.1989) (parental consent abortion law; privacy amendment to state constitution embraces more privacy interests and extends more protection to individual interests than Federal Constitution). Also see e.g. *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985) (search and seizure); *Dupree v. Alma School Dist.,* 279 Ark. 340, 651 S.W.2d 90 (1983) (school financing); *Malan v. Lewis,* 693 P.2d 661 (Utah 1984) (guest statute); and *Turner v. Jones,* 330 S.E.2d 323 (W.Va.1985) (paternity limitations and due process).

provision in accordance with what [the court] conceive[d] to be its plain meaning." *Id.* at 674–675. The court held an inventory search was unreasonable as a matter of state constitutional law, a search which the Supreme Court had upheld on Fourth Amendment grounds. See *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, *supra.* We specially note these types of state court decisions as examples that the federal constitutional safeguards applicable to the states reprsent the *minimum* standard for state courts, and the state courts are not *limited* to those standards in their construction of state's rights. *Olson v. State,* 484 S.W.2d 756, 762 (Tex.Cr.App. 1972) (Opinion On Appellant's Motion for Rehearing).

Returning to the Texas Constitution, it is, we believe, significant that our Bill of Rights is the first article in our state constitution and that it held this position in each of Texas's five state constitutions.[20] Such placement indicates the degree of importance of these provisions to the drafters of the constitution and the citizens of this state, as opposed to the federal Bill of Rights which was *amended to* the end of the federal counterpart.

Further, there is *direct* evidence which indicates the framers of the 1845 constitution did not intend for our state constitution to be interpreted in lock-step with the federal constitution. A Washington County constitutional delegate proposed that the 1845 document be construed *in pari materia* with the Bill of Rights to the United States Constitution. This proposal was not adopted, thus indicating the framers did not intend to limit the rights of citizens of this State to that which protects them under the federal constitution. Ponton, Arvel (Rod), III, *Sources of Liberty in the Texas Bill of Rights,* 20 St. Mary's L.J. 93, 109 (1988).[21] Clearly our own state constitu-

tion was not intended by our own founding fathers to mirror that of the federal government.

Therefore, given the foregoing reasons and the numerous decisions tacitly addressing the "interpretation issue", we now expressly conclude that this Court, when analyzing and interpreting Art. I, § 9, Tex. Const., will not be bound by Supreme Court decisions addressing the comparable Fourth Amendment issue.[22] In reaching this conclusion, we recognize that state constitutions cannot subtract from the rights guaranteed by the United States Constitution, but they can provide additional rights to their citizens. The decisions of the Supreme Court represent the *minimum* protections which a state must afford its citizens. "The federal constitution sets the floor for individual rights; state constitutions establish the ceiling." *LeCroy v. Hanlon,* 713 S.W.2d at 338.

As to the issue presented in the case *sub judice,* the legality of an inventory search, we decline to blindly follow the Supreme Court's decisions interpreting the Fourth Amendment in addressing the issue under Art. I, § 9. Cases, including those cited herein, in conflict are overruled to the extent of that conflict. The court of appeals concluded based on our pronouncements in *Eisenhauer, Brown, Osban,* etc., that Art. I, § 9 and the Fourth Amendment were materially the same and thus construed our constitutional provision in accordance with Fourth Amendment law, an analysis not countenanced by our decision today. See *Heitman v. State,* 776 S.W.2d 324, 325 (Tex.App.—Fort Worth 1989). Thus, this cause is remanded to the court of appeals for consideration of appellant's state constitutional claim in light of this decision.[23]

WHITE, J., dissents.

---

**20.** Harrington, *id.* at p. 21.

**21.** Although the article references footnote 118 as its source, the correct reference is footnote 116.

**22.** This is not to say that United States Supreme Court cases will not be permissive authority, just as court decisions from other states may be.

**23.** We do not, by this opinion, retreat from our pronouncement in *DeBlanc v. State,* 799 S.W.2d 701 (Tex.Cr.App.1990) wherein, citing *McCambridge v. State,* 712 S.W.2d 499, 501–502 n. 9 (Tex.Cr.App.1986), we indicated that briefs asserting rights under Article I, Sec. 10 of the Texas Constitution were inadequate if they did not provide either argument or authority in support of that assertion. Thus we declined to

McCORMICK, Presiding Judge, dissenting.

Today the majority remands appellant's conviction to the Court of Appeals to consider a ground not briefed before this Court. Instead, the majority adopts the doctrine of "independent state grounds," and without guidance leaves to the Court of Appeals the formulation of our state law.

For these reasons I respectfully dissent.

---

address those asserted rights. The same principles apply herein. As we stated in *McCambridge*, p. 501–502 n. 9: "In his brief before the Court of Appeals and this Court, appellant provided several constitutional bases for each ground of error and review. Attorneys, when briefing constitutional questions, should carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground. If sufficient distinction between state and federal constitutional grounds is not provided by counsel,

this Court may overrule the ground as multifarious. (citation omitted). But see art. 44.33, r. 306(d), V.A.C.C.P., [now TRAP 74(*o*), (p) and R. 203] and cf. *State v. Jewett*, 146 Vt. 221, 500 A.2d 233 (Vt.1985) (appellate courts may require supplemental briefs if state constitutional issue not sufficiently developed).