COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-013-CR

 

 

KATHRYN ANN VANDERBURGH                                             APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM THE 43RD
DISTRICT COURT OF PARKER COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  Introduction

In one point, Appellant Kathryn Ann Vanderburgh
asserts that the trial court erred by taking into account evidence of a
homicide while determining her sentence for a DWI conviction.  We affirm.








                              II.  Factual and Procedural History

Vanderburgh was indicted for the offense of
driving while intoxicatedCfelony repetition, to which she
pleaded guilty without a plea bargain. 
The trial judge acknowledged having read the presentence investigation
report, and Sergeant Chris Reed and Corporal Eric Chambless of the Haltom City
Police Department and Vanderburgh testified at the punishment trial.

Sergeant Reed testified that in March 2007, he
responded to two 911 calls concerning a reported drunk driver at a local
fast-food restaurant.  Upon his arrival,
Sergeant Reed observed Vanderburgh erratically driving her vehicle around the
restaurant and onto the sidewalk, her vehicle straddling the narrow curb that
divided the drive-through lane from the adjoining property.  Specifically, he testified that she was
driving like she was in one of the toy cars at a Six Flags amusement park, A[the
one] that you ride but you don=t really
have to steer because they just bounce along on a track.@  Sergeant Reed conducted a DWI investigation
and described Vanderburgh as barely able to stand and Aextremely
intoxicated.@ 
He testified that it was apparent that she had defecated in her pants.








At one point during the stop, Vanderburgh stated
to Sergeant Reed that she needed to go home because she thought her roommate
was dead.  Sergeant Reed asked her why
she thought that, and she replied, AWell, I
just think that she is.@ 
When Sergeant Reed asked her if someone should be sent to the apartment
to assist her roommate, she replied, ANo.@  Sergeant Reed testified that he assumed these
statements were just the rambling of a highly intoxicated person.  He also noted that Vanderburgh had light
burns about her face[2]
and did not know how she was able to operate her car without hitting something
or someone because of her condition. 
Instead of taking Vanderburgh into custody, he released her to an
ambulance.

The next day, Sergeant Reed was dispatched to
assist in a death investigation at Vanderburgh=s
apartment.  He testified that Vanderburgh
had asked a neighbor to check on her roommate=s
condition, and the neighbor discovered that she was dead, with a gunshot wound
to the chest; the police were called. 
Sergeant Reed spoke with Vanderburgh again, who appeared to be in the
same intoxicated condition she had been in the night before.  He also noticed that Vanderburgh was still
wearing the same pants from the night before. 
On cross-examination, Sergeant Reed testified that Vanderburgh had been Ano
billed@ by a
Tarrant County grand jury for any charges resulting from the death of her
roommate.








Corporal Chambless testified that it was apparent
that Vanderburgh=s roommate died from a single
gunshot wound to the chest.  He found the
body on the floor, next to the bed in the single-bedroom efficiency
apartment.  He interviewed Vanderburgh at
the police department and stated that she told him that after arriving at the
hospital the previous evening, she removed her IV, which accounted for some
blood on her clothing, left the hospital, took a taxi, and went home.[3]  At some point, she went out, bought more
wine, and continued drinking.  Corporal
Chambless testified that he understood that Vanderburgh had gone to a neighbor
to find out if her roommate was dead and then the police were called.

Corporal Chambless confirmed that Vanderburgh was
Ano
billed@ from
any offense surrounding the death of her roommate.  On cross-examination, he testified that, in
his opinion, the grand jury was incorrect in deciding to Ano bill@
Vanderburgh for her roommate=s
homicide, that he did not believe Vanderburgh=s
version of events surrounding the death of her roommate, and that the case was
now closed and no longer under investigation.








Vanderburgh described herself as a fifty-seven
year old alcoholicCa binge drinker who had battled
alcohol dependency for years.  She
testified that she binge-drank as a result of pain from a broken shoulder but
that she Asuppose[d] there=s no excuse@ to
binge drink.[4]  At the time of her arrest, she weighed under
100 pounds and her blood alcohol content (ABAC@) was
.30; she agreed that at a BAC level of .40, she would have been dead.

Vanderburgh testified that she had five prior DWI
convictions, three in Texas and two in California, the first in 1993, and that
her numerous attempts at completing alcohol abuse rehabilitation programs in
various places over a period of years had not been successful.  She took AAntabuse@ to try
to prevent her drinking from 1994 to 2002, as a condition set by her
then-husband to sustain their marriage. 
She spent twenty-eight days at a rehab center in the
Hurst-Euless-Bedford area in 1993, participated in the EXCEL alcohol treatment
program at Timber Lawn in Dallas for a few months in 1994, went to rehab in
Pennsylvania for several weeks in October 2003, and spent sixteen months in New
Jersey in rehab.  She had also been sent
to a mental hospital in Massachusetts at one point because she had threatened
to commit suicide.  She received
counseling for her alcohol problem while on probation for DWI in 2005 and 2007.








Vanderburgh told the trial judge that she did not
see a solution to her alcoholism and admitted that there was no question but
that she was guilty as charged in this case. 
On cross-examination, Vanderburgh also admitted to being on a Tarrant
County DWI probation at the time she committed the present DWI offense in
Parker County, denied having any memory about how her roommate got shot,
confirmed her actions surrounding her roommate=s death
as related by the State=s witnesses, and stated that at
the time, she was Aso drunk [she] didn=t even
know [the roommate] was dead.@

Vanderburgh asked for a probated sentence with
extensive inpatient alcohol treatment. 
The State asked for a sentence of between eight to ten years.  The trial judge stated that based on
Vanderburgh=s numerous failed attempts to
treat her alcohol problem, he had to protect the community by keeping her off
the highway.  He then sentenced
Vanderburgh to eight years=
confinement.  This appeal followed.

                                   III.  Punishment Evidence








Vanderburgh posits her sole issue as follows: AIn this
case the Appellant is not objecting to the sentence imposed, which is within
the statutory limits for the offense; but rather is objecting to the manner in
which it was arrived at,@ referring to the evidence
admitted concerning her roommate=s
death.  The State responds that
Vanderburgh failed to preserve her issue for review because she failed to
object at trial and that Vanderburgh waived any error because the evidence she
complains of now was also admitted in various places without objection.

A.  Standard of Review 

While our review of a trial court=s
admission or exclusion of evidence is under the abuse of discretion standard,
including extraneous offense evidence during the punishment phase of a trial, Mitchell
v. State, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996); Erdman v. State,
861 S.W.2d 890, 893 (Tex. Crim. App. 1993), a complaining party must preserve a
complaint for our review, that is, they must have presented to the trial court
a timely request, objection, or motion that states the specific grounds for the
desired ruling if they are not apparent from the context of the request,
objection, or motion.  Tex. R. App. P.
33.1(a)(1); Mosley v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998)
(op. on reh=g), cert. denied, 526
U.S. 1070 (1999).  Further, the trial
court must have ruled on the request, objection, or motion, either expressly or
implicitly, or the complaining party must have objected to the trial court=s
refusal to rule.  Tex. R. App. P.
33.1(a)(2); Mendez v. State, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).









Additionally, an objection must be made as soon
as the basis for the objection becomes apparent.  Tex. R. Evid. 103(a)(1); Lagrone v. State,
942 S.W.2d 602, 618 (Tex. Crim. App.), cert. denied, 522 U.S. 917
(1997); Polk v. State, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987).  And to preserve error, a party must continue
to object each time the objectionable evidence is offered.  Fuentes v. State, 991 S.W.2d 267, 273
(Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington v.
State, 819 S.W.2d 854, 858B59 (Tex.
Crim. App. 1991).  A trial court=s
erroneous admission of evidence will not require reversal when other such
evidence was received without objection, either before or after the
complained-of ruling.  Leday v. State,
983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991).  This rule
applies whether the other evidence was introduced by the defendant or the
State.  Leday, 983 S.W.2d at 718.

B.  Trial Testimony

The
following evidence was admitted without objection during the punishment phase
of Vanderburgh=s trial. 

 

Cross Examination
(Sergeant Reed)

 

Q.  Officer, is this the same situation on March
3 of 2007, that Ms. Vanderburgh was no billed for a murder charge?

 

A.  Yes, that=s correct.

 








. . .
. 

 

Direct Examination
(Corporal Chambless)

 

Q.  Okay. 
Did you respond to the death investigation [Sergeant Reed] was taking
about?

 

A.  I did.

 

Q.  All right. 
And when you got out there, did you meet Ms. Vanderburgh?

 

A.  I did.

 

Q.  And did you get a chance to go through the
crime scene?

 

A.  I did.

 

. . .
. 

 

Q. .
. . .  [W]ho was the deceased person?

 

. . .
. 

 

A.  I believe her name was Becky Mooney.

 

Q.  All right. 
We=ll just call her Becky if
that=s all right.  Where was Becky when you found her?

 

A.  On the floor next to the bed.

 

Q.  In the one and only bedroom?

 

A.  Yes.

 

Q.  All right. 
And did you find that she had been shot?

 

A.  Yes.

 








. . .
. 

 

Q. . . . .  Where was she shot on her person?

 

A.  Just above her left breast.

 

Q.  Okay. 
And whereCwhat was the location
where she had been shot, if you could tell?

 

A.  On the bed.

 

Q.  All right. 
Did you have a chance to speak with Ms. Vanderburgh about the death of
her roommate?

 

A.  I did. 

 

. . . . 

 

Direct Examination
(Corporal Chambless)

 

Q.  Corporal Chambless, just so that the time
line=s clear for the court,
from what you understand, her roommate is shot, however that happens, and then
the defendant Ms. Vanderburgh goes out, is arrested for DWI and then sent to
the hospital instead of being taken to jail, and then she gets out, comes back
home, and the neighbor gets contacted, I guess, by the defendant to find out if
her roommate=s dead, according to the
defendant, and then you all come out there; is that pretty much it?

 

A.  Yes.

 

Q.  Okay. 
And as counsel asked Sergeant Reed, that case actually was no billed by
the Tarrant County grand jury?

 

A.  Yes.

 

. . . . 

 

Cross Examination
(Corporal Chambless)








Q.  Is there any new evidence that=s come to light since
March of >07 that could help us
determine if she did commit a murder or not?

 

A.  That case has been closed and I=m no longer investigating
it. 

 

. . . .

 

Cross Examination
(Vanderburgh)

 

Q.  And whatever happened, at some point you got
intoxicated, and at some point you=re holding a gun, and somehow it goes off and she
gets shot, right?

 

A.  I don=t really know what happened. . . .  And I don=t know what happened.  And maybe ICI don=t know.  But if I=m responsible, by golly, I willCI would  do anything. 
Anything.  I take responsibility
for what I do.  And it=sC

 

Q.  Let me ask you this, regardlessCregardless of whether you
shot her, she shot herself, whatever happened, when you left your apartment
there, okay, and you went out, you knew you were drunk, right?

 

A.  Yes.

 

. . .
. 

 

Q. .
. . .  Wouldn=t you agree that [her
conduct related to the roommate=s death] should have been a wake-up call,
something that made you stop drinking, sit up and go, AOh my God, I=ve got to stop doing
this[?]@ . . .

 

A.  I don=t know, sir. 
It was a horrible thing.  I=ve never been around
anybody who was dead.  And I was so drunk
I didn=t even know she was
dead.  And to think that I was in the
apartment with someone that was dead is beyond my imagination. 

 

Q.  Okay. 
But you actually left her there, as you thought she was dead, and went
out and got a DWI, right?

 








A.  All of that is not clear to me.  I know it wasCthat was heard today, but
it was not clear to me.

 

Q.  Okay. 
Would you disbelieve the officer if he said that heCthat you told him that
you had a friend that you left home and thought she was dying or you remember
dying?

 

A  I think he said that I thought she was
dead.  And I don=t know why I would say
that.

 

Q.  But in fact it was true.

 

A.  Yes, it was true.

 

. . . .

 

Q.  Do you know how long it was after you got
back there to the apartment and started drinking again that you finally went up
and got your neighbor to find out if Becky had passed away?

 

A.  Those are not the details.  As soon as I got back, I started drinking
again, I believe.  And uhCI don=t know exactly what time
it was the next afternoon.  And there was
a knock on the door.  And I asked the
woman to check on her.  I didn=t go get the
neighbor.  I asked her to check on
her.  And then I asked her to call the
police because I didn=t have a telephone.

 

Q.  So if she didn=t come downstairs and
knock on your door, there=s no telling how long it
would have been before you notified somebody that your roommate was laying
there in your apartment dead.

 

A.  That=s
possible.  I don=t know.

C.  Analysis








It is readily apparent that the record is replete
with evidence of Vanderburgh=s
roommate=s death,
its investigation, and her no-bill from the grand jury and that her trial
counsel made no objection to any of it. 
Therefore, Vanderburgh failed to preserve her issue for review.  We overrule her sole issue.

                                          IV.  Conclusion

Having overruled her sole issue, we affirm the
trial court=s judgment.

 

PER
CURIAM

 

PANEL:  MCCOY, WALKER, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: June 18, 2009











[1]See Tex. R. App. P. 47.4.





[2]Vanderburgh testified
that the burns on her face occurred when she lit a cigarette and Ait just kind of blew up
in [her] face.@





[3]Vanderburgh testified
that she was drunk during the interview with Corporal Chambless and did not
remember the entire interview.





[4]She also testified about
a number of other physical problems that she had, including osteoporosis,
pleurisy, and serious eye problems.