

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,596

**JOHN WILLIAM HUMMEL, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 1184294D
### IN THE 432ND DISTRICT COURT
### TARRANT COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

In June 2011, a jury convicted Appellant of murdering Clyde Bedford and Joy

Hummel during the same criminal transaction. TEX. PENAL CODE § 19.03(a)(7)(A).

Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal

Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced Appellant to

death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is

---

[1]Unless otherwise indicated, all future references to Articles refer to the Texas Code of
Criminal Procedure.

automatic. Art. 37.071, § 2(h). Appellant raises twenty points of error. After reviewing Appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## FACTS

In Fall 2009, Appellant resided in a house on Little School Road in Kennedale with his pregnant wife, Joy Hummel; their five-year-old daughter, Jodi Hummel; and Appellant's father-in-law, Clyde Bedford. Appellant worked as an overnight security guard at Walls Hospital in Cleburne, and he often stopped at an E-Z Mart convenience store in Joshua on his way to and from work. He met Kristie Freeze, who worked as a clerk at the E-Z Mart, and he called and texted her numerous times between October and December 2009. Freeze testified that Appellant told her that he was married, but he was not in love with his wife. Freeze also informed Appellant that she was divorcing her husband and dating someone else. Although Freeze initially told Appellant that they could only be friends, they sent each other sexually explicit text messages and eventually had sexual intercourse on December 10. Appellant informed Freeze that his wife was pregnant a few days later. Freeze instructed Appellant not to contact her anymore, but he continued to call and text her. On December 16, Freeze told Appellant that her divorce had become final.

Lorie Lewallen, a cook who worked the night shift at the Huddle House restaurant near the E-Z Mart, testified that Appellant regularly came into the restaurant on his way to

and from work in December 2009. He usually wore his work uniform, sat in a booth that faced Lewallen, and talked to her while she cooked. However, when Appellant was there on the night of December 16, he sat facing away from Lewallen, wore "street clothes," and "reeked of cologne." Lewallen testified that Appellant was unusually quiet and seemed "like something was on his mind" that night.

Freeze testified that she permitted Appellant to visit her and her young daughter at their apartment in Joshua on the evening of December 17. Appellant arrived after dark wearing his security-guard uniform and stayed for about thirty minutes.

In the early morning hours of December 18, emergency personnel responded to a fire at Appellant's home. A passerby noticed that the house was on fire shortly after 12:00 a.m. and called 9-1-1. When police officer Joshua Worthy arrived at the scene approximately fifteen minutes later, he kicked open the front door and was unable to see anything but smoke and flames inside the house. He yelled to determine if anyone was inside, but no one responded. He also noticed that the back door to the residence was open. Firefighters later extinguished the blaze and discovered the burned bodies of Joy, Jodi, and Bedford, each inside of his or her bedrooms. Jodi and Bedford were found in their beds. Joy was located on the floor, with blood-soaked clothing nearby. Agent Steven Steele of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") investigated the scene and observed that Joy had injuries to her hands and upper body that appeared to be caused by some means other than the fire.

Appellant approached Officer Worthy outside the house at around 4:30 a.m. He asked Worthy what had happened and "if everyone had made it out[,]" Worthy replied that he did not know, and he accompanied Appellant to his minivan that was parked in a church parking lot across the street. Worthy and Appellant conversed while Appellant sat in his minivan and smoked a cigarette. Appellant told Worthy that he lived in the house with his pregnant wife, daughter, and father-in-law. Worthy testified that Appellant placed his "head down in his hands" a few times during their conversation, but he "wasn't crying" and was just "basically sitting there." When Captain Darrell Hull walked over to them and asked Appellant what he had been doing that evening, he replied that he had gone to Walmart to check prices for Christmas presents. Appellant continued to ask "if everybody had made it out[,]" and the officers again responded that they did not know.

Hull testified that Appellant agreed to follow him to the Kennedale Police Department in his own minivan, and they arrived around 5:15 or 5:30 a.m. Hull took Appellant to a room and asked Appellant to write a statement explaining what happened. He left Appellant alone in the room to write his statement and began recording Appellant. Hull testified that Appellant signed a witness statement that read,

> So I left my home around 9:00 p.m. I drove down to Joshua to visit a friend but [he] was not home. I drove around for awhile to wait and see if he would come home, but he didn't. I stopped and got gas, drove around some more. Then I began to visit Walmarts to price things for Christmas. I came home a little after 5:00 a.m. and found it burned down, and firemen and police were still there.

Appellant also provided written consent for police to search his house and van.

During the interview with Detective Jason Charbonnet, Sergeant Eric Carlson, and Agent Steele, Steele noticed what appeared to be blood on Appellant's pants. Steele testified that Appellant agreed to give him the clothes Appellant was wearing in exchange for clothes provided by another officer. When Appellant changed clothes, Steele observed blood on the bottom of his sock and scratch marks on his back.

Appellant thereafter left the police department and went to the office of his employer, Champion Security, in Arlington. He arrived at 8:00 a.m. He attended a meeting, then picked up his paycheck before leaving the office at 11:00 a.m. Co-workers who spoke to Appellant that morning were unaware that anything unusual had happened until people began calling and asking for him later that day. Appellant's co-workers and his friends from church were unable to reach him on his cell phone. Later, a concerned friend went to the police department to file a missing-person report on Appellant.

Steele and other arson investigators ultimately determined that the fire at Appellant's home was an "incendiary fire," and they ruled out accidental causes. Steele testified that there were three separate and distinct fires, or "areas of origin," within the house. Shiping Bao, the Deputy Medical Examiner who performed Joy's autopsy, testified that Joy was pregnant with a fourteen to fifteen week old fetus when she died. Joy had a total of thirty-five stab wounds, including ten to her chest, two to her abdomen, one to her right thigh, seven to her neck, and fifteen to her back. She suffered damage to her internal organs, including her heart, lungs, and liver. She had incised wounds on her

hands that appeared to be defensive in nature. She also had six lacerations on her skull, which indicated that she had been struck multiple times with a hard object. Bao concluded that the cause of Joy's death was multiple stab wounds and the manner of her death was homicide. The lack of soot in her airways and the lack of carbon monoxide in her blood indicated that she was dead before the fire. Deputy Medical Examiner Gary Sisler testified that both Bedford and Jodi suffered extensive skull fractures. Sisler determined that the cause of their deaths was blunt-force injury, the lack of soot in their airways indicated that they were dead before the fire, and the manner of their deaths was homicide.

On December 20, Customs and Border Protection Officer ("CBP") Jorge Bernal encountered Appellant at the United States port of entry between Tijuana, Mexico, and San Ysidro, California. Bernal testified that Appellant approached his booth on foot and presented himself for entry into the United States at 5:48 a.m. When Bernal entered Appellant's name and date of birth into the computer system, an "armed and dangerous" notification "popped up on [the] screen." Appellant was handcuffed and taken to the Port Enforcement Team for further investigation. He was later transported to the San Diego County Jail.

That night, Kennedale officers Carlson and Charbonnet and Investigator James Rizy of the Tarrant County District Attorney's Office arrived at the San Diego County Jail. They mirandized Appellant, conducted a videotaped interview with him, and

obtained consent to search his minivan in San Ysidro and his hotel room in Oceanside,

California. Appellant confessed his involvement in the instant offense both orally and in

writing. Rizy testified that Appellant's written statement read,:

> I left the house at 9:00 p.m. Thursday[,] December, 12/17/2009, in my uniform. Stopped at a store to get some cigarettes off of Mansfield Highway. Went to Joshua to visit Kristie. Sat in her living room to watch TV. I left her house and went and got gas. I then went home, killed my family, set the house on fire, drove around and looked around for a place to dump the weapons.

> Then I drove back to Burleson to go to that Walmart. Then just drove around and stopped at various other [w]almarts to be seen on camera until it was time for me to go home. I knew I could not tell y'all I was working because y'all would check. I then went to the police station in Kennedale and lied to detectives about knowing what happened.

> On 12/18 of '09, after being released by detectives, I realized they had enough evidence to prove I did [those] horrible . . . things. So I went to my work office to pick up my check and cashed it. I then proceeded to drive to California late Saturday night. I arrived in Oceanside, California, and met a man. We drove down to Tijuana. Returning to U. S., border patrol checked my ID and found out I had [a] warrant. I'm glad that I got caught so I could tell the truth about what happened.

> I remember standing there holding the kitchen knife contemplating on whether or not to kill my wife for about 30 minutes. I stabbed her in the neck. She screamed. The knife broke. She began to try and fight back. I grabbed the baseball bat and hit her in the head repeatedly until she fell on the ground. Then I grabbed some of my other knives and swords [and] began stabbing her.

> I then killed my father-in-law and daughter by striking them in the head with a baseball bat. Then I set the fires.

Officers collected video that confirmed Appellant's presence at Huddle House on

December 16 and E-Z Mart on December 17. They also obtained video that confirmed

Appellant's presence at Walmart stores in Burleson, Grand Prairie, and Arlington on December 18. Store receipts indicated that Appellant was present at the Burleson Walmart at 1:46 a.m. and the Grand Prairie Walmart at 4:33 a.m.

In the early morning hours of December 21, officers searched a dumpster at an auto parts store in Arlington, Texas, and found a number of weapons including an aluminum baseball bat, a large sword and sheath, a small sword and sheath, a dagger, and a kitchen knife. The small sword, dagger, and kitchen knife were contained in a white plastic trash bag, and the handle of the dagger appeared to be broken. DNA testing was performed on these weapons and on Appellant's clothing that he gave to officers at the Kennedale Police Department.

Appellant's socks and pants had areas that tested positive for blood. Joy's DNA profile matched DNA profiles from Appellant's socks and pants, as well as the large sword, dagger, and kitchen knife. Bedford's DNA profile was the same as DNA profiles that were obtained from Appellant's pants and the white plastic trash bag. Jodi's DNA profile was the same as a DNA profile obtained from an area on the aluminum baseball bat that tested presumptively positive for blood. The DNA profile obtained from the dagger handle and the large sword sheath was the same as Appellant's DNA profile. Neither Appellant nor Joy could be excluded as contributors to a DNA mixture that was obtained from the small sword.

### SUFFICIENCY OF THE EVIDENCE

In point of error one, Appellant claims that the evidence is legally insufficient to support his conviction. When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding a defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

Appellant argues that the evidence is insufficient because "other than [his] illegally obtained confessions," there is no evidence that connects him to the deaths of Joy and Bedford. However, in evaluating whether the evidence is sufficient to sustain a conviction, we consider all the evidence that the trial judge permitted the jury to consider, including erroneously admitted evidence, if any. *Garza v. State*, 213 S.W.3d 338, 344 (Tex. Crim. App. 2007).

In addition to Appellant's statements, there is other evidence that strongly connects him to the murders of Joy and Bedford. Phone records and video evidence confirmed his affair with Freeze and his whereabouts prior to committing the crime. Shortly after the crime, police observed blood on his clothing and scratches on his back. DNA evidence connected the victims to the blood on his clothing and the weapons he discarded in the

dumpster. He was recorded on video at various Walmart stores as he attempted to fabricate an alibi on the night of the crime. And he fled to California shortly after being questioned by police in Kennedale. *See Clay v. State*, 240 S.W.3d 895, 906 n.11 (Tex. Crim. App. 2007) (citing *Fentis v. State*, 582 S.W.2d 779, 780–81 (Tex. Crim. App. 1976)) (noting that evidence of flight evinces a consciousness of guilt). The evidence, viewed in the light most favorable to the verdict, was sufficient for the jury to rationally conclude that Appellant murdered Joy and Bedford in the same criminal transaction. Point of error one is overruled.

### JURY EXCUSES

In point of error eighteen, Appellant claims that the trial court "erred in denying [his] motion to quash the jury panel due to noncompliance with proper jury procedures when, without a presiding judge and outside of his presence, the prospective jurors submitted juror cards and were granted purported disqualifications and excuses." He specifically asserts that the trial court called a special venire and then improperly designated the bailiff to hear excuses.

Commonly, when prospective jurors are initially summoned, they are placed in a general venire. *Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001); TEX. GOV'T CODE § 62.015. Members of the general venire are qualified on their ability to serve, and exemptions and excuses are heard and determined by the judge presiding over the general venire or "the court's designee" if the county has a plan adopted by the commissioner's

court. *Jasper*, 61 S.W.3d at 423; TEX. GOV'T CODE § 62.110. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. *Jasper*, 61 S.W.2d at 423. In the event that a court runs out of eligible veniremembers, the court shall order the sheriff or constable to summon additional prospective jurors to provide the requisite number of jurors for the panel. TEX. GOV'T CODE § 62.015(b).

In a capital case, the trial court may choose to issue a writ commanding the sheriff to summon a "special venire" from which the jury is to be selected. Art. 34.01. There is a distinction between a special venire and the formation of panels through a general venire. *Chambers v. State*, 903 S.W.2d 21, 30 (Tex. Crim. App. 1995). In a special venire called in a capital case, the trial court cannot designate others to make decisions with respect to excuses. *Id.* However, a designee is not prohibited from making such decisions in a general venire. *Id.*; *see* Art. 35.03, § 2. "This is because at the time the summoned jurors apply for excuses, they have not been assigned to any particular case." *Chambers*, 903 S.W.2d at 30.

On April 26, 2011, the trial court held a hearing on Appellant's motion to quash the jury panel. Paula Morales, the "jury bailiff" in Tarrant County, testified at the hearing that she operates under a plan that was recommended by the district judges of Tarrant County and approved by the Commissioner's Court. *See* Art. 35.03, § 2. A person who is summoned may claim one of the exemptions listed on the back of the jury summons and

either mail it to the jury bailiff or submit it online. Upon receipt, Morales or another staff member of the Tarrant County Jury Services Office determines whether to grant the exemption. If the exemption is granted, then the summoned person is notified that he or she is excused and does not have to report for service. Regarding those who appear on the date of the summons, Morales testified:

> I go over all exemptions, disqualifications, read them to everyone in the room, I put them under oath, I hear the exemptions, disqualifications, those that were removed from the list along with any postponements that are requested that day, and then once we remove those, we start making our court assignments.

She testified that the panel assignments are made at "random from the room," and when the summonses are sent, there is no way to know which people will be assigned to which court.

Morales testified that a venire was summoned for Thursday, April 28, 2011, and that the trial court in the instant case made a request for a panel of jurors to be drawn from that venire. Morales knew from past experience how many jurors to summon on certain days of the week. She would generally summon 400 people on Thursdays, in order to have about 100 people show up for jury service. However, she needed to summon extra people because the trial court in this case requested a larger panel than usual. The trial court initially requested 185 panel members, later increasing the number to 210. Morales therefore decided to summon 1,200 people, in order to have about 300 people to accommodate the instant case and others. She testified that she would constitute the panel

for this particular case on April 28. She added that "[o]nce they're assigned to the Court, they're not under my jurisdiction any longer," and it would be up to the trial court to grant any further exemptions and excuses.

Appellant contends that the trial court's request to summon additional jurors in the instant case "was, in effect, a special venire[,]" and thus the trial court could not designate the bailiff to hear and determine excuses. Appellant, however, acknowledges that the trial court denied his motion requesting a special venire. And Morales's testimony established that, at the time the summoned jurors applied for excuses, they had not been assigned to any particular case. *See Chambers*, 903 S.W.2d at 30. The trial court's request to summon additional jurors did not transform this general venire into a special venire. *Id.* ("[A]t the time . . . summoned jurors apply for excuses, they have not been assigned to any particular case. There is no way of knowing what kind of case the prospective jurors would subsequently be assigned to, capital or noncapital.").

Appellant also complains that his constitutional rights were violated because "a number of potential jurors who were summoned for Appellant's trial [were] excused by Bailiff Morales outside of the presence of Appellant and his attorneys and without the knowledge or consent of Appellant or his attorneys." We have held that the general venire portion of jury selection is not considered part of "the trial" and therefore the accused is not entitled to be present. *Jasper*, 61 S.W.3d at 423; *Moore v. State*, 999 S.W.2d 385, 399 (Tex. Crim. App. 1999); *Chambers*, 903 S.W.2d at 31. Point of error eighteen is

overruled.

## MOTIONS TO SUPPRESS

In points of error two through seventeen, Appellant challenges the trial court's denials of his multiple pretrial motions to suppress. We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010). We review the trial court's factual findings for an abuse of discretion, but review the trial court's application of law to the facts de novo. *Id.* Points of error two through five-A[2] pertain to the trial court's denial of Appellant's "Motion No. 70," in which he moved to suppress his oral and written statements "to an agent of the U.S. Bureau of Alcohol, Tobacco and Firearms and to members of the Kennedale Police Department on or about December 18, 2009." Appellant contends that the trial court erroneously denied the motion because his statements were involuntary and were taken in violation of his rights under Article 38.22 and the Fifth and Fourteenth Amendments to the United States Constitution.[3]

_____

[2]Appellant's brief contains two separate points that are each labeled "Point of Error 5." Here, we address the "Point of Error 5" set out on page 17 of his brief, in which he asserts that his "rights as guaranteed under the Article 38.22 of the Texas Code of Criminal Procedure were violated because [his] statement to agents of the Kennedale Police Department and the U.S. Bureau of Alcohol, Tobacco and Firearms was involuntary." For purposes of this opinion, we will refer to this claim as point of error five-A. Below, we will address the "Point of Error 5" set out in the table of contents and on page 29 of his brief, in which he asserts that the trial court erred "when it overruled [his] motion to suppress evidence seized from his residence in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution." For purposes of this opinion, we will refer to that claim as point of error five-B.

[3]Appellant also claims that his statements were taken in violation of his rights under Article I, Section 9, of the Texas Constitution. Because Appellant does not provide separate

The trial court held a pretrial hearing on Appellant's motion to suppress. With regard to the statements that Appellant made at the Kennedale Police Department, the State presented his written witness statement, the DVD and transcript of his videotaped interview, the testimony of Captain Darrell Hull, Detective Jason Charbonnet, Sergeant Eric Carlson of the Kennedale Police Department, and ATF Agent Steven Steele.

Hull testified at the suppression hearing that he initially reported to Appellant's residence during fire-suppression efforts on December 18. He arrived at 2:20 a.m. and returned to the police department at 4:48 a.m. He was thereafter informed that a resident had returned, and he was summoned back to the scene. When he arrived at around 5:15 a.m., he approached Officer Joshua Worthy and Appellant in the church parking lot across the street from Appellant's house. Hull testified that Worthy was standing four to five feet away from Appellant, who was sitting in his minivan on the driver's side with the door open and "his legs and feet hanging outside of the vehicle . . . ." Appellant asked Hull if anyone got out of the house, and Hull responded that he did not know. Appellant also stated that his wife, daughter, and father-in-law were in the house when he left to go Christmas shopping that evening. Hull asked Appellant "if he would like to go to the police station to get out of the [cold] weather, sit down, have something to drink, [and]

authority or argument for his state constitutional claim, we decline to address it. *Heitman v. State*, 815 S.W.2d 681, 690–91 n.23 (Tex. Crim. App. 1991). Further, although he briefly alleges that he did not voluntarily consent to the seizure of his clothing at the police department, he does not develop this argument or provide authority in support of it. Thus, we decline to address this portion of his argument because it is multifarious and inadequately briefed. TEX. R. APP. P. 38.1.

have a place to go." Appellant agreed, got out of his minivan, and began walking towards the patrol car. Hull stopped him and said, "[I]f you want to take your own vehicle, you're more than welcome to take it, that way if you need to leave or want to leave, you're more than welcome to do so." Appellant elected to follow Hull to the police department in his minivan.

When Appellant arrived at the police department, he parked in the general parking area for visitors. He walked inside with Hull, who took him to an interview room. Appellant asked to use the restroom first, and Hull accompanied him because the interview room was located in a secure area and he had to show Appellant where to go. When they returned to the interview room, Hull asked Appellant if he was willing to write a statement about "what took place the evening prior to the fire." Appellant agreed, so Hull gave him a witness statement form and "asked him to start from the point of that evening when he left the house and what happened since then." Hull testified that he did not read Appellant his *Miranda*[4] rights because he thought Appellant was just a witness.

Hull exited the room as Appellant sat at the desk and began writing his statement. He did not inform Appellant that he began videotaping him at that time. Charbonnet and Steele then arrived to speak with Appellant.

Charbonnet testified at the suppression hearing that the cause and origin of the fire had not yet been determined when he and Steele arrived to interview Appellant.

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Charbonnet initially did not consider Appellant a suspect. His purpose was "[t]o find out any information that [Appellant could] provide . . . ." Both officers testified that Appellant was not under arrest, was free to leave at any time, and that he took breaks to use the bathroom and smoke cigarettes. Charbonnet testified that officers escorted Appellant on his breaks in accordance with police-department policy.

In response to their questions about the previous night, Appellant told Charbonnet and Steele that he went to Joshua to visit a friend from work named "David," but he was not home. Appellant said he ended up driving around Joshua for three hours while listening to the radio, then he stopped to get gas and drove to various Walmart stores "to price stuff for Christmas." Appellant said he did not know David's last name or address, and he could not remember all of the Walmart stores that he went to that night. Charbonnet testified that he thought that "there was more to the story than what [Appellant] was saying." Steele testified that it quickly became apparent to him that Appellant's responses were "not truthful."

Charbonnet and Steele expressed their skepticism of Appellant's story and asked him for more information. At one point, Charbonnet suggested the possibility that an altercation occurred in the home prior to the fire:

> [CHARBONNET]: John, I've got a -- I've got a quick question for you, if you don't mind. It appears that there was -- there was some sort of possible, like an altercation or something at your house. Okay? And, you know, between possibly maybe you and your wife or you and your father-in-law or something. What were ya'll mad about?

[APPELLANT]: We weren't mad about nothing.

*     *     *

[CHARBONNET]: So, you know, if I told you that, you know, somebody did make it out and they told me that there was an altercation, what would you say to that?

[APPELLANT]: I'd want to know what happened.

[CHARBONNET]: That there was an altercation between you and your wife. That's what I want -- that's what I'm trying to figure out. Or you and your father-in-law.

[APPELLANT]: No.

[CHARBONNET]: Nothing?

[APPELLANT]: Nothing.

[CHARBONNET]: Why would somebody tell me that?

[APPELLANT]: (Shakes head side to side).

[CHARBONNET]: It's your turn to answer, Mr. Hummel.

[APPELLANT]: I don't have one. I don't know why someone would say that.

[CHARBONNET]: Because it's -- it's very apparent that, you know -- it's apparent to me -- and I've been doing this a long time. Okay? Mr. Steele here has been doing this a long time also. Okay? I want you to really think hard about what's important here. Okay? That there was a small altercation or something like that, that's okay. All right? Because like Mr. Steele] said, you just don't go drive around for hours and hours and hours and you don't [know] where . . . things like that. Okay? It's time to, you know, tell us really what's going on and what happened. That way, we can figure out and put the pieces of this whole puzzle together.

[APPELLANT]: I don't know what happened. I'm telling you, I've been

driving around all night --

[CHARBONNET]: Okay.

[APPELLANT]: -- going to different Walmarts and stuff.

[CHARBONNET]: And you see why it doesn't make a whole lot of sense?

[APPELLANT]: (Shakes head side to side).

[CHARBONNET]: You don't see why it doesn't make a whole lot of sense?

[APPELLANT]: No.

Charbonnet acknowledged at the suppression hearing that there was in fact no witness to an altercation at Appellant's home and that this information was a "fabrication."

Steele thereafter asked Appellant if he would be willing to submit to a polygraph examination:

[STEELE]: Well, . . . your story doesn't make sense. I'm sorry. I've been doing this a long, long time. He's been doing this a long time. And what your story looks like is you went and . . . checked your balance at an ATM so you could show you were there. And you got gas in Joshua about 10:45 so you could show you were there. The problem is, when the fire started, there's this big gap and the fire started in that big gap that you've got. And the fire didn't just start in one place, it started in several places. So somebody set the fire in the house. And you're not going to help yourself -- you know, people have issues and people have arguments and sometimes bad things happen.

[APPELLANT]: We haven't had anything like that.

[STEELE]: Okay. Would you then -- then I'm sure you'd be willing to take a polygraph?

[APPELLANT]: Yes.

Charbonnet and Steele again expressed disbelief in Appellant's story and asked him to tell them what really happened. They both testified at the suppression hearing that they noticed something on Appellant's pants while they were questioning him. Charbonnet described it as "some sort of reddish-brownish material[,]" and Steele testified that it appeared to be blood. Charbonnet made the first request for Appellant to provide them with his clothes:

> [CHARBONNET]: John, do you have any other clothes to put on?
>
> [APPELANT]: Just my work clothes.
>
> [CHARBONNET]: Well, right now we're going to probably take your clothes from you that you're wearing. We're going to need the shoes, because the story that you're saying doesn't make any sense whatsoever. And I'm going to be real honest with you. I don't believe you one bit, unfortunately. I think that -- I think that you want to believe what you're telling us. And I think you've thought it out how, kind of spur of the moment and you did the best that you thought that you could [based] on what you saw on television. But unfortunately, this is the real world.
>
> And like I told you, we're going to find out. It's whether you want to go through all that stuff, it's up to you, but we're going to find out.

Appellant requested and received a bathroom break. When he returned to the interview room, he provided written consent to search his house and van. He signed the consent form at 6:41 a.m. Steele then made another request for his clothes:

> [STEELE]: All right. And these are -- these are the pants that you had on?
>
> [APPELLANT]: (Shakes head up and down).
>
> [STEELE]: We're going to need you to give us those.

[APPELLANT]: You got something I can put on?

[STEELE]: Yeah, we'll get you something. Okay.

Appellant asked for a break, and Steele accompanied him to the bathroom where he gave Steele the clothes he was wearing. Steele testified that "[t]he need for the clothes was there before I ever began to interview him, because that is a typical process . . . of eliminating somebody," and "it's fairly common to ask for the clothing of a homeowner or business owner if . . . there's any suspicion it's an arson." Steele testified that Appellant was "very cooperative" and "never voiced any disagreement" about providing his clothes. Steele gave him clothing to change into and Appellant "just started undressing and handed [him] the clothes as he put the others on." Steele testified that he observed blood on Appellant's sock when he took off his boots.

When they returned to the interview room, Steele told Appellant that the "status on the fire scene" was that "[t]hey're working the fire" and there were three unidentified persons in the house. Charbonnet then stated:

> [CHARBONNET]: John, since I took your clothes from you, okay, I need you to [listen] to me about something. Okay? It's very important that you listen to me. All right? You're not under arrest. Okay? Just so you understand, I'm going to read your Miranda warnings to you. Okay? Do you understand that?
>
> [APPELLANT]: (Shakes head up and down).

Charbonnet then read Appellant his *Miranda* warnings, and Appellant said he understood each warning as it was read to him. He signed and initialed the warning form at 6:59 a.m.

Charbonnet testified that when he gave Appellant the warnings he wanted "to make sure that he knew that he was not under arrest and that he was free to leave at any time."

Charbonnet and Steele continued to question Appellant and to discuss the possibility of having him submit to a polygraph examination. At one point, Charbonnet asked, "How did you get the marks on you?" Appellant replied, "Playing with my dog."

Carlson thereafter entered the room and began participating in the interview. Carlson gave Appellant multiple bathroom breaks and provided him with aspirin because he complained of a headache. Carlson questioned Appellant regarding the details of what happened the night before, and Appellant repeated his version of events and claimed to have no knowledge regarding the fire. Carlson reminded him that "[p]hysical evidence never lies" and stated:

> [CARLSON]: What happened at your house tonight? We know there was a fire. That one was pretty easy to figure out. We know that people died in that fire, John. We know by looking at the physical evidence that there's no possible way that fire started in one place. We can tell just by looking at it. By the end of the weekend, we're going to know if there was an accelerant used. We're going to know if the people that died in that fire died from the fire or some other injury. And all of those things that the evidence will tell us will be the truth. So we'll know that part.
>
> We'll be able to draw pictures, extrapolate theories out to the end, sift through the pieces, find what we need to. We'll take the clothes that we got from you and we're going to send those off to a lab and they'll be analyzed, scrutinized. Forensic scientists will go over them and collect particulate matter down to microns inside. They'll look for fibers and hairs, blood, oil, grease, gasoline. They'll search all those things. Then we'll know the truth from those. So we'll be able to gather all this stuff and look at it.
>
> And all that evidence, all of that truth will be brought out to light and it will

point in some direction. It will tell us what we need to know. Based on all that information that we get from there, the truth that we learn, we'll use those truths to answer other questions that we have, to follow up on other leads, go down those roads.

John, what's the analysis of your clothes going to tell me whenever I get it back? What's it going to say?

[APPELLANT]: I don't know.

Carlson testified that Appellant acted quiet and concerned when he first began talking to him. A few times during their conversation, Appellant "would begin emotional outbursts" with loud crying and sobbing, "and then he would stop." Carlson added that he never saw tears coming from Appellant's eyes during these outbursts.

At the end of the videotaped interview, Appellant told Charbonnet that he planned to stay with his mother, and he provided contact information and drew a map to her residence. Charbonnet stated, "We'll get in touch with you. Okay?" He also said, "I'd like to have that work uniform, sir." Carlson testified that he obtained Appellant's blue uniform shirt from him when they walked out to his minivan.

Following the suppression hearing, the trial court denied Appellant's motion to suppress and made the following findings of fact and conclusions of law:

[D]uring the early morning hours of December 17th, 2009, Kennedale Fire Department and Police Department responded to the residential fire located at 600 Little School Road.

The fire and police dispatcher received call of the residential fire, [and] dispatched the police and fire units to that location. First on the scene was Officer Worthy, who conducted a cursory search and attempt[ed] to determine if anybody was inside the house, but the fire had taken hold to

such an extent that it prevented his entry into the residence to conduct a full search.

Outside the residence, no one came forward to identify themselves to the officer as the owner of the residence. Soon thereafter, firefighters arrived and discovered the residence to be fully engulfed in flames. Firefighters immediately deployed fire suppression efforts. During the effort, firemen used portable lights to see their way during -- during the firefighting effort. They seen -- the scene, during the firefighting efforts clearly depicts the situation that fits the definition of exigent circumstances; more bluntly, a life and death situation.

It is clear from the pretrial exhibits that were offered by the State and admitted, that the fire fully enveloped the residence interior and that the residence was no longer inhabitable.

Firefighters, after . . . conducting a sweep of the residence for people, did not find anybody in the habitable spaces and turned their focus on suppressing the fire. A total of three searches for the victims during the firefighting effort were found [sic].

Due to the body or the corpse's burnt condition, it is clear no life-saving efforts could have been possible. While firefighters worked to put out the fire and begin the investigation, [and to] determine the cause of the fire, Defendant came forward to Kennedale Police Department Captain Hull, [and] identified himself as the owner of the residence.[5]

The Defendant expressed to the officer that others lived in the residence together with him, including his pregnant wife, five-year-old daughter and father-in-law.         Police officers requested the Defendant come to their offices to give a statement regarding the residential fire.

The Defendant, driving himself to the Kennedale Police Department offices, arrived at approximately 5:00 a.m. Kennedale Detective Charbonnet and Captain Hull began the interview with Mr. Hummel regarding his

---

[5]The record reflects that Appellant first identified himself to Worthy, and that Hull returned to the scene after being informed that a resident had come forward.

whereabouts and the events before the fire.[6] These -- these matters were recorded and videotaped.

Mr. Hummel gave a written statement recalling events leading up to the fire. And that would be Pretrials 15, 16 and 17. Pretrial 20, which was at 6:41, was the Defendant giving . . . consent to search the residence.

So basically at this point, I'm covering facts that will touch upon Motion 71 and Motion 70.

After bringing the fire to control and the fire had breached the resident's . . . ceiling and floor, the firefighters had to pull down the ceiling to ensure the fire was finally put out and [had not] spread into the attic. However, the fire continued to smolder for hours thereafter.

At 6:59 the Defendant was Mirandized. Deputy Tarrant County Fire Marshal Larry Ingram and Mike Rehfeld arrived at the scene. Later, United States Alcohol, Tobacco, Firearm, Explosives Agent Steve Steele arrived to join in the ensuing investigation.

Approximately 10:15, State District Judge George Gallagher signed the law enforcement authority search warrant authorizing the search and seizure of the evidence -- of any evidence from 600 Little School Road. The warrant was properly authorized.

After 10:15 a.m., Medical Examiners removed the bodies from the residence. At the end of the suppression efforts, the residence was in ruin. It was not capable of being used as a dwelling.

The Defendant complains [that the] Fourth and Fourteenth Amendments . . . prohibit the unreasonable search and seizure of his residence and lack of setting probable cause in the -- in the search warrant.

The State has supplied a number of cases that were for the Court's review, and the Court does rely on them, as well as considered some of the Defense's cases as well. It's clear that during the initial interview on December 18th, 2009, the Miranda warnings were not required, including

---

[6]The record reflects that Hull was the first to converse with Appellant at the police department, followed by Charbonnet and Steele, and later, Carlson.

during the focus questioning by Officer Charbonnet and Agent Steele. Because the Defendant was not under arrest, free to move and choose [sic] to do so and . . . ultimately, he departed the location -- or departed the police department without arrest.

Concurrently, there [was] clothing that was supplied by the Defendant, and the Court does conclude that it was provided voluntarily.

Therefore, it's the Court's holding that the Defendant's Motion No. 70 should be and is hereby denied. The video recording and written statements are hereby admissible.

Appellant argues that he was "in custody at the time he was interrogated by the Kennedale police officers and the A.T.F. agents." Therefore, he contends that the officers should have given him *Miranda* and Article 38.22 warnings prior to questioning him. *Miranda*, 384 U.S. at 444–45. He complains that the officers instead waited "approximately one hour and thirty-three minutes into the interrogation" to read him the warnings, "even though he was the obvious suspect and the investigation had focused on him." However, being the "focus" of an investigation does not necessarily render a person "in custody" for purposes of receiving *Miranda* warnings or those required under Article 38.22. *Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009). The appropriate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Further, an "officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned" may be a factor that bears upon the assessment whether that individual was in

custody. *See Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010) (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). However, this is only a factor to consider "if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.*

The warnings required by *Miranda* and Article 38.22 are intended to safeguard a person's privilege against self-incrimination during custodial interrogation. *Gardner*, 306 S.W.3d at 294. This Court has found four general situations that may constitute custody for purposes of *Miranda* and Article 38.22:

(1) The suspect is physically deprived of his freedom of action in any significant way;

(2) A law enforcement officer tells the suspect he is not free to leave;

(3) Law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and

(4) There is probable cause to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave.

*Id.*

The evidence shows that Appellant voluntarily agreed to leave the scene and go to the police department. Hull specifically told Appellant that he could drive himself there in his own car so he could leave if he wanted or needed to do so. Hull considered Appellant to be only a witness, and Appellant voluntarily agreed to provide him with a written

witness statement. Although Charbonnet and Steele's suspicions were aroused during the interview, Appellant was specifically told that he was not under arrest, and he was allowed to leave the police department after speaking with them. In the few hours that he was at the police department, Appellant took multiple breaks to use the bathroom and smoke cigarettes upon request. He was also provided with aspirin when he complained of a headache. When Charbonnet read Appellant his *Miranda* warnings after Appellant gave the officers his clothes, he clearly stated to Appellant that he was "not under arrest." *See Dancy v. State*, 728 S.W.2d 772, 777 (Tex. Crim. App. 1987) (stating that "mere recitation of such warnings is more indicative of proper cautiousness than it is of the officer's intent to arrest"). The officers testified that Appellant was very cooperative and never invoked any rights or voiced any objections about writing a statement, being interviewed, or providing his clothes.

Appellant asserts that he was subjected to "repeated coercive efforts of the officers to persuade and induce [him] into making a statement." The officers expressed skepticism of Appellant's answers, asked for his clothing, and tried to persuade him to tell the truth, but we are unable to conclude that a reasonable person in these circumstances would believe that he was not free to leave. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime").

Appellant has failed to establish that his statements were involuntary or that he was subjected to custodial interrogation on December 18.

Appellant further points out that Steele told him during the interview that "the fire didn't just start in one place, it started in several places," and "somebody set the fire in the house." We understand Appellant to argue, as he did in "Motion No. 70," that his oral statements after that point were "obtained as a direct result of the illegal, warrantless search of [his] residence . . . which was previously conducted by agents of the State; and thus, such statements are 'tainted' as a result of such illegal search."

A warrantless entry into a residence is presumptively unreasonable. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). However, a burning building creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. *Michigan v. Clifford*, 464 U.S. 287, 293 (1984). Once in the building, officials need no warrant to remain for "a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* (quoting *Michigan v. Tyler*, 436 U.S. 499, 510 (1978)). The aftermath of a fire often presents exigencies that will not tolerate the delay necessary to obtain a warrant. *Id.* For example, an immediate threat that the blaze might rekindle presents an exigency that justifies a warrantless postfire investigation. *Id.* at 293, n.4. Immediate investigation might also be necessary to preserve evidence from intentional or accidental destruction. *Id.* Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases. *Id.* at 293.

At the suppression hearing, Lieutenant Joshua Galbreath with the Forest Hill Fire Department testified that he received a call shortly after midnight on December 18 to provide mutual aid for the fire at Appellant's residence. When he arrived approximately ten minutes later, there was "heavy fire everywhere," and members of the Kennedale Fire Department were already conducting fire-suppression efforts. Shortly thereafter, Galbreath's unit entered the residence and discovered bodies inside. Galbreath testified that at that time, there were "hazardous conditions" and fire-suppression efforts were continuing in some areas of the house. Charbonnet, a certified arson investigator, testified that fire-suppression efforts were ongoing when he arrived at the scene at around 1:30 a.m. Charbonnet entered the residence at around 3:00 or 3:30 a.m. and took photographs for his investigation of the cause and origin of the fire. Charbonnet testified that it was necessary to enter the house at that time "[d]ue to the fact that . . . evidence could be readily destroyed if further overhaul of the scene were to take place."

Steele testified that he also arrived at the scene around 1:30 a.m. after a member of the Tarrant County Fire Marshal's Office asked him to "assist in [the] origin and cause [investigation]." Charbonnet initially told Steele that he thought it was an accidental fire because he "had observed some electric space heaters in the structure." Steele also "went in to do an initial size-up on the structure . . . ." At that time, there was still "an extreme amount of smoke" inside the residence. Steele's initial observations of the fire-communication patterns inside the residence led him to believe that "this was probably

not an accidental fire."

Charbonnet testified that he did not know the cause and origin of the fire at the time he spoke to Appellant at the Kennedale Police Department. Charbonnet and Steele resumed their investigation of the residence after Judge Gallagher signed the search warrant at 10:15 a.m. They both testified that firefighters were "putting out hot spots" most of the day and into the evening. That evening, the arson investigators concluded that it was an incendiary fire.

We disagree with Appellant's contention that his statements are the fruit of an illegal search. The record reflects that: (1) firefighters entered the residence to fight the blaze; (2) hazardous conditions persisted when Charbonnet and Steele entered to investigate the cause and origin of the fire; (3) Charbonnet believed that immediate investigation was necessary to preserve evidence from further destruction; and, (4) firefighters continued to extinguish "hot spots" throughout the day and evening. The warrantless entries at issue were justified under these circumstances.

The trial court did not abuse its discretion in denying Appellant's "Motion No. 70." *See Young v. State*, 283 S.W.3d 854, 873–74 (Tex. Crim. App. 2009) (stating that a reviewing court must uphold a trial court's ruling on a motion to suppress if it is reasonably supported by the record and correct under any theory of law applicable to the case). Points of error two through five-A are overruled.

Points of error five-B through seven pertain to the trial court's denial of

Appellant's "Motion No. 71," in which he moved to suppress "all the physical evidence seized from [his] residence . . . ." Appellant contends that the trial court erroneously denied this motion in violation of his rights under Article 38.23 and the Fourth and Fourteenth Amendments to the United States Constitution.[7]

As discussed above, the trial court found after the suppression hearing that: the fire at Appellant's residence "continued to smolder for hours" after it was brought under control; a judge signed a search warrant for Appellant's residence at 10:15 a.m. on December 18; the medical examiners removed the bodies from the residence after 10:15 a.m.; and, the residence was "in ruin" and "was not capable of being used as a dwelling" at the end of the fire-suppression efforts. The trial court also made the following findings of fact and conclusions of law:

> With regard to Motion No. 71, Motion to Suppress the Evidence Seized From the Residence in Violation of Federal and State Constitutional Law and Statutory Law, the Defendant complains that [the search] was in violation of his Fourth Amendment rights and that it was not . . . conducted pursuant to a search warrant.
>
> The Court concludes that it was clearly an exigent circumstance. The authorities responded in the early morning hours to the residential fire. The exhibits and testimony clearly establish that. Even as an emergency [the] situation continue[d] for a reasonable period thereafter.
>
> After the firefighters brought the -- the fire under control and discovered the

---

[7]Appellant also claims that evidence was seized from his residence in violation of his rights under Article I, Section 9, of the Texas Constitution. Because Appellant does not provide separate authority or argument for his state constitutional claim, we decline to address it. *Heitman*, 815 S.W.2d at 690–91 n.23.

three victims, the consent to search was executed at [6]:41 a.m.[8] That's Pretrial Exhibit No. 20. Subsequently, there was a search warrant at 10:15 a.m.

The search of residence continued through most of the day until late in the afternoon. The similar case[s] the Court has relied on [are] Michigan versus Clifford and Michigan versus Tyler.

However, there is a pre-Tyler case, Steigler versus Anderson, 496 F.2d 793, cert denied 419 U.S. 1002. It is very enlightening. Basically, it was a -- it was a writ of habeas corpus post-conviction writ where the facts are very similar to this case.

The warrant was authorized appropriately by Judge Gallagher, in this Court's opinion, and comported with all federal and state laws.

Therefore, the Defendant's Motion No. [71] is hereby denied. The evidence seized from the Hummel residence . . . on December 19th, 2009, was lawful because the evidence was seized pursuant to exigent circumstances up to and including late in the afternoon on December 18th, 2009, to determine the fire's origin, the removal of the corpses and the collection of physical evidence.

Alternatively, first the search was conducted pursuant to a consent executed by the Defendant; second, an appropriate authorization . . . was made by Judge Gallagher; third, the Defendant no longer had a reasonable expectation of privacy because the dwelling was no longer habitable or capable of being secured or ensuring his privacy; fourth, the State had a caretaking function to remove the . . . corpses discovered by the firefighters at that location.

Appellant specifically argues that the evidence should have been suppressed because the search warrant was invalid. He complains that "the information contained in the search warrant affidavit included information [unlawfully] obtained from Appellant's

---

[8]The trial court stated that "the consent to search was executed at 9:41 a.m." However, the record reflects a time of 6:41 a.m.

earlier interrogation and the warrantless 'walk-through' search." He further complains that the search warrant was based on an affidavit that failed to establish probable cause that a specific offense had been committed, that the items to be searched for would constitute evidence of that offense, and that the evidence would be located at the place to be searched. *See* Art. 18.01(c).

The trial court upheld the validity of the search based, not only on the search warrant, but also because of exigent circumstances, Appellant's consent, a lack of a reasonable expectation of privacy, and the State's community-caretaking function. We must uphold the trial court's ruling on the motion to suppress if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Young*, 283 S.W.3d at 873–74. Appellant's sole complaint is about the validity of the search warrant.[9] However, Appellant signed a form consenting to the search of his residence several hours before the search warrant was issued. Because the record supports a finding that Appellant voluntarily consented to the search of his residence, we need not address Appellant's argument attacking the validity of the search warrant. *Id*. Points of error five-B through seven are overruled.

In points of error eight through ten, Appellant claims that the trial court violated his statutory and constitutional rights when it denied "Motion No. 72," in which he

---

[9]The State points out that Appellant "must attack all independent grounds supporting an adverse ruling." *See Smith v. State*, 286 S.W.3d 333, 342–43 (Tex. Crim. App. 2009); *James v. State*, 356 S.W.3d 728, 734 (Tex. App.—Fort Worth 2011, pet. ref'd); *Marsh v. State*, 343 S.W.3d 158, 161–62 (Tex. App.—Texarkana 2011, pet. ref'd).

moved to suppress "all the physical evidence seized from the person of the Defendant and obtained as a result of his arrest by agents of the U. S. Customs and Border Protection Service . . . ." Appellant argues on appeal that this evidence was seized when he was improperly detained at the border due to "intentional lies and falsehoods of the Kennedale Police Department to the U. S. Customs Officers."

In "Motion No. 72," Appellant specifically complained about "[a]ny and all items of physical evidence seized from the Defendant at the time of his arrest by agents of the United States Customs and Border Protection Service, or subsequent to his arrest and as a result thereof . . . ." In that motion, however, he did not identify the specific "items of physical evidence" about which he was complaining. And in the "Memorandum of Law in Support of Motions to Suppress" that Appellant filed in the trial court, he simply acknowledged that "the State did not delineate at the evidentiary hearing any specific items of evidence seized from the person of the Defendant at the time of his arrest which they intend to introduce at the Defendant's trial . . . ."[10]

Appellant also fails to identify on appeal the "physical evidence" that was improperly seized from him at the border and erroneously admitted at trial. *See Gonzales*

---

[10]In the memorandum of law, Appellant added that "certain oral statements were allegedly made by the Defendant to custodial officers while in the custody of the United States Customs and Border Protection Service while he was incarcerated at the San Ysidro Port of Entry (to Wackenhut Security Officer Ted Lehmann); and later, when he was booked into the San Diego Central Jail (to Classification Deputy C. Darnell)." The statements to Lehmann and Darnell were apparently at issue in Appellant's "Motion No. 73," but Appellant is not complaining about these particular statements on appeal.

*v. State*, 966 S.W.2d 521, 524 (Tex. Crim. App. 1998) (stating that if "the fruits" of an illegal arrest are unclear, then the appellate court need not address the merits of the claim). He instead complains about the recorded and written statements that he made to Charbonnet, Carlson, and Rizy in the San Diego County Jail after a Tarrant County judge issued an arrest warrant for arson of a habitation. Appellant challenged the admission of these statements in "Motion No. 76," which is at issue in points of error fourteen through seventeen on direct appeal.

To the extent that Appellant is arguing that these particular statements were the fruits of an illegal detention at the border, his claim is without merit. Appellant contends that, at the time he arrived at the border crossing, there was a missing person report, but no warrant for his arrest. He asserts that Kennedale police officers lied to border-protection agents "about the existence of an arrest warrant with the intent of keeping [him] in custody," and that he "would have been release[d] except for the lies of the Kennedale police department." Based on the evidence presented at the suppression hearing, the trial court found otherwise. The trial court found that the border-protection agents detained Appellant in a routine manner when he could not provide sufficient documentation to gain entry to the United States. During the identification check, the border-protection agents received notification that Appellant was "missing from Texas" and "armed and dangerous," so they transferred him "to a secondary area for further identification." When they "contacted the Kennedale Police Department to confirm the

information," they were notified that an arrest warrant "was in the process of being obtained." Upon verification of the warrant, they transferred Appellant "to the San Diego Sheriff's Office to detain [him] until Texas law enforcement officers arrived." The trial court found that the border-protection agents had authority pursuant to federal law to detain Appellant under the circumstances, and it denied Appellant's "Motion No. 72."

The trial court's ruling is supported by the record of the suppression hearing. CBP agents Jorge Bernal, Ernesto Enriquez, and Paul Kandal testified that they were following their policies and procedures when they detained Appellant for further identification and verification of his status. Enriquez testified that when he called the Kennedale Police Department to verify Appellant's status, he was told to "hold [Appellant] because he has a warrant." Enriquez then referred Appellant to Kandal. Captain Darrell Hull of the Kennedale Police Department testified that he told Kandal that he was "in the process of getting an arrest warrant," that he communicated updates to Kandal while in the process of getting the warrant. He also stated that he notified Kandal when the warrant was obtained. Kandal confirmed that he knew Appellant did not initially have an arrest warrant and that Kennedale police officers were working to obtain one. Because the trial court's findings are supported by the record, they will not be disturbed on appeal. Points of error eight through ten are overruled.

In points of error eleven through thirteen, Appellant complains about the trial court's denials of "Motion No. 74" and "Motion No. 75," in which he moved to suppress

all of the physical evidence seized from his vehicle and hotel room in California. Appellant contends that the trial court erroneously denied these motions in violation of his rights under Articles 1.06 and 38.23, and the Fourth and Fourteenth Amendments to the United States Constitution.[11] He specifically complains about the admission of "various photographs showing items found in the Coast Inn room and his vehicle," labeled State's Exhibits 277 through 302.

Charbonnet testified at the suppression hearing that he, Carlson, and Rizy met with Appellant at the San Diego County Jail at approximately 10:00 p.m. on December 20. Appellant acknowledged and waived his *Miranda* rights before confessing the details of his involvement in the instant offense. At approximately 11:20 p.m., Appellant told them the location of his vehicle and hotel room. Appellant also signed two Tarrant County "Consent to Search" forms authorizing the search of his vehicle and hotel room. Both Rizy and Appellant read the forms aloud before Appellant signed them. By signing these forms, Appellant acknowledged that he voluntarily waived his constitutional rights to be free from a warrantless search and to refuse consent, and that he voluntarily gave consent "without being subjected to any threats, promises, compulsion[,] or persuasion of any

---

[11]Appellant states in the heading for point of error eleven that evidence was seized from his vehicle and hotel room in violation of his rights "under the Fifth and Fourteenth Amendments to the U. S. Constitution." However, his argument pertains to the Fourth and Fourteenth Amendments. Appellant also claims in point of error twelve that the evidence was seized in violation of his rights under Article I, Section 9, of the Texas Constitution. Because Appellant does not provide separate authority or argument for his state constitutional claim, we decline to address it. *Heitman*, 815 S.W.2d at 690–91 n.23.

kind." The forms indicate that Appellant signed them at 12:30 a.m. The forms were altered to indicate that the property was located in San Diego, California, instead of Tarrant County, Texas. Rizy testified that "[s]ince we had to make the changes on the form that indicates San Diego, California, that just for the abundance of caution, we were going to work on getting a search warrant through the State of California."

Charbonnet testified that in the early morning hours of December 21, members of the San Diego Police Department located Appellant's vehicle. Carlson asked them "if it could be impounded" and "if it could be taken to a secure storage facility and held there until we could obtain a search warrant." Charbonnet testified that the vehicle was towed "to their impound yard into a secure facility" after Appellant had provided consent to search. Charbonnet learned from Investigator George Darrah that the Oceanside Police Department had located and secured Appellant's hotel room. Charbonnet testified Darrah informed him that "they did an initial cursory search of the inside of the room to make sure nobody was in it and then placed an officer outside the door and waited for . . . Darrah to arrive with any type of search warrants." Shortly before 2:00 p.m., Darrah signed an affidavit for a search warrant in the presence of Judge Elias of the Superior Court in San Diego County. Judge Elias then issued a search warrant for Appellant's vehicle and hotel room.

Rizy testified that they did not ask other authorities to assist in the investigation until after Appellant had given them consent to search his vehicle and hotel room. After

that point, local officers located and secured Appellant's vehicle and hotel room. Appellant's vehicle was towed to an impound lot, but was not searched until after the California warrant was signed. Officers conducted an "initial walk-through" of the hotel room to make sure there was no one inside, then they left the room and secured it for the search that took place after the California warrant was signed. When defense counsel initially asked Rizy if the officers videotaped the interior of the hotel room, he stated:

> Q.    Did you know that prior to the execution of the warrant, when they first secured the hotel room, they actually went inside the hotel room and videotaped the interior of the motel room?
>
> A.    I'm aware of that now, but I was not aware of it at that time.

Upon further questioning by defense counsel, Rizy clarified:

> Q.    [Y]ou were aware that there [was] a walk-through done and a protective sweep, and that after that was done, that the officers backed out and secured the room or something like that; is that right?
>
> A.    Yes, sir.
>
> Q.    You also knew, did you not, that there was an evidence technician that went with him and videotaped the entirety of the inside of the room?
>
> A.    The evidence technician went in with the search warrant, as far as I'm -- I'm aware of.
>
> Q.    You didn't know that there was an evidence technician [that] went in and videotaped that room during that initial sweep?
>
> A.    I don't believe so.

Rizy further testified that he was present during the search of the hotel room after the warrant was obtained. Carlson was present during the search of the vehicle.

Following the suppression hearing, the trial court denied Appellant's motions to suppress based on the following findings of fact and conclusions of law:

> Regarding Motion No. 74, Motion to Suppress the Physical Evidence Seized from the Defendant's Vehicle; and Motion No. 75, regarding the Motion to Suppress Seized Evidence from the Defendant's Hotel Room, the Defendant complains items taken from the vehicle were taken without a valid search warrant lacking probable cause or valid consent or other lawful authority, and if [it] was lawful, [it] was tainted by the prior unlawful seizure of the vehicle in violation of state and federal law.
>
> The Defendant also complains that the evidence seized from Oceanside, California hotel room was done so in violation of federal and state laws. Motion No. 75.
>
> The Defendant, during the meeting with the Tarrant County law enforcement officer, duly executed -- executed a duly authorized consents [sic] to seize, search and confiscate items from his maroon minivan from Texas and Hotel Room No. 26 located in the Coast Inn, Oceanside, California. State's Exhibits No. 26 and 27.
>
> \*     \*     \*
>
> The Defendant clearly, knowingly and intentionally gave his consent to conduct a search and seizure for criminal evidence located within his vehicle, hotel room, based upon the testimony and the evidence adduced during the Motion to Suppress hearing. Despite having the consent to search the Defendant's vehicle and hotel room, Tarrant County District Attorney Investigator Rizy and Kennedale Police Department officers secured the assistance of the Oceanside Police Department, Detective George W. Darrah . . . and appl[ied] for a search warrant for the hotel room rented by -- by Mr. Hummel, the Defendant, and Mr. Hummel's vehicle.
>
> State's Pretrial Exhibit No. 30. Upon reviewing the affidavit, the Court finds that probable cause existed for the issuance of the warrant to seize, search and collect criminal evidence from the hotel room and vehicle was done in conformity of federal and state requirements under the laws of the State of California and Texas [sic].

\*   \*   \*

Accordingly, Defendant's Motions No. 74, 75 are hereby denied.

The trial court upheld the validity of the searches at issue based on both the search warrant and Appellant's consent. However, Appellant complains only about the search warrant on appeal. He argues that Darrah's probable-cause affidavit was "tainted" because it contained information obtained from "earlier illegalities" that occurred when he was questioned at the Kennedale Police Department on December 18. He contends that there was no probable cause "to believe that any of the items listed in the warrant exist, or that they would be located within Appellant's vehicle or hotel room." He also complains that his vehicle was seized and his hotel room was searched before a warrant was issued.

We must uphold the trial court's ruling on the motion to suppress if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Young*, 283 S.W.3d at 873–74. The record supports a finding that Appellant voluntarily consented to the searches of his vehicle and hotel room. The evidence also shows that officers secured Appellant's vehicle and hotel room after he gave consent. Therefore, we need not address his arguments attacking the validity of the search warrant. *Id.* Points of error eleven through thirteen are overruled.

In points of error fourteen through seventeen, Appellant complains about the trial court's denial of "Motion No. 76," in which he moved to suppress his oral and written statements to Charbonnet, Carlson, and Rizy at the San Diego County Jail on December

20 and 21. Appellant claims that the trial court erroneously denied the motion because his statements were involuntary and were taken in violation of his statutory and constitutional rights.[12]

On December 20, Tarrant County District Court Judge Gallagher signed a warrant to arrest Appellant for the offense of arson of a habitation, which was based on a probable-cause affidavit signed by Detective Charbonnet. Appellant claims that the arrest warrant is "defective" because the affidavit contains "no facts even remotely tending to connect [him] to the commission of this offense." He also complains that Charbonnet misrepresented the facts by stating in his affidavit that Appellant "showed no emotion" during his interrogation at the Kennedale Police Department. *See Franks v. Delaware*, 438 U.S. 154 (1978). He claims that, as a result of the "defective" arrest warrant, he was "illegally detained in the San Diego County Jail and all statements obtained are inadmissible as 'fruit of the poisonous tree.'"

The trial court found after the suppression hearing that there was probable cause to issue the arson arrest warrant, stating,

> Regarding the Franks complaint by the Defense -- and this would be Franks
> v. Delaware, 438 U.S. 154, whereby the Defense is seeking to suppress
> based upon a complaint that there was a falsehood or reckless disregard for
> the truth by the affiant.

---

[12]Appellant claims that his statements were taken in violation of his rights under both the federal constitution and Article I, Section 9, of the Texas Constitution. Because Appellant does not provide separate authority or argument for his state constitutional claim, we decline to address it. *Heitman*, 815 S.W.2d at 690–91 n.23.

> The Court has considered the Defendant's contention that the emotional outburst during his interrogation in Texas was genuine, and that the inclusion of the lack of genuine emotion as alleged in -- and contained in the arrest warrant affidavit voided the warrant. That will be pretrial State's Exhibit No. 24.
>
> In an abundance of caution, the Court, upon redacting the objectionable portion of the affidavit, concludes that there was sufficient probable cause existing for the issuance of the warrant for the arson of a habitation as determined by Judge George Gallagher.
>
> The Court does not make a determination whether the inclusion of the lack of emotion was a deliberate falsehood, because the statement regarding lack of emotion is a conclusion made by anyone, is a matter of opinion, [h]ow would a person appropriately respond under similar circumstances.
>
> Rather, did the issuance of the warrant turn upon the inclusion of the lack of emotion asserted by the affiant. In this case, the answer is no. Had the answer been, yes, the inquiry would have continued.
>
> Also, upon further examination of the Defendant's videotaped interview at the Kennedale Police Department, the emotion exhibited by the Defendant, the videotape, is not clearly an emotional outburst.
>
> The Court cannot conclude the statement made by the affiant officer regarding the Defendant's emotional response was correct, incorrect or a fabrication or reckless.

The trial court also found that the statements at issue "were lawful" and "were Mirandized." Alternatively, if there was "any unlawfulness" in Appellant's arrest and detention, then "attenuation of the taint . . . eliminate[d] the unlawful acts and allow[ed] the Defendant's statement that was made later to law enforcement officers at the San Diego Jail." Based on its findings, the trial court denied Appellant's motion to suppress.

In assessing the sufficiency of an affidavit for an arrest or a search warrant, the

reviewing court is limited to the four corners of the affidavit. *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004). The reviewing court should interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences. *Id.* We must defer to the magistrate's finding of probable cause if the affidavit demonstrates a substantial basis for his conclusion. *Rodriguez v. State*, 232 S.W.3d 55, 64 (Tex. Crim. App. 2007).

The facts that can be derived from the four corners of Charbonnet's affidavit are: firefighters responded to a fire at Appellant's residence at approximately 12:18 a.m. on December 18; the back door was open with the door handle in the "locked position" and "no signs of forced entry"; the bodies of Joy Hummel, Clyde Bedford, and "a young child" were located in separate bedrooms in the residence; there appeared to be a large amount of human blood near Joy's body; there were no signs of communication between fires on opposite sides of the residence; an accelerant detection canine alerted to multiple locations in the residence; the "origin and cause investigation produced no accidental sources for the fire"; arson investigators concluded that this was "a series of intentionally set fires throughout the habitation," which could "be ruled an Arson in accordance [with] section 28.02 of the Texas Penal Code"; Appellant "showed no emotion" upon arrival at the scene; he said the doors were locked when he left his residence at 9:00 p.m. on December 17; he provided a receipt showing that he purchased $20 of gasoline at 10:47 p.m.; he appeared to have dried blood on his socks and pants during his interview at the

Kennedale Police Department; he "showed no emotion" when he was informed during the interview that firefighters had found the bodies of his family members inside the residence; he failed to attend a memorial service for his family members on December 18; he failed to contact authorities regarding the remains of his family members; no friends or family members had seen or heard from him after he left the Kennedale Police Department at 7:00 a.m. on December 18; a fellow church member filed a missing-person report for him on December 19; and, he was later located by border-protection agents as he tried to re-enter the United States from Mexico on foot through the port of entry in San Ysidro, California on December 20.

Based on these facts, the magistrate had a substantial basis for concluding that probable cause existed to issue the arrest warrant. Appellant, however, argues that the warrant must be voided pursuant to *Franks* because Charbonnet falsely stated that Appellant lacked emotion after learning that his family members died in the fire. In *Franks*, the United States Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks*, 438 U.S. at 155–56.

The State responds in part that Appellant "failed to lay the required predicate" because he raised his *Franks* claim "for the first time in his memorandum filed with the trial court *after* the suppression hearing concluded." But even if we were to assume that Appellant made a substantial preliminary showing that Charbonnet knowingly and intentionally or recklessly made a false statement in his affidavit, Appellant's claim would fail because the statement at issue was not "necessary to the finding of probable cause." *Id.* at 156. The remaining facts in the affidavit gave the magistrate a substantial basis to find -- either directly or through reasonable inference -- probable cause to issue a warrant to arrest Appellant for arson of a habitation. The trial court did not err in denying Appellant's motion to suppress. Points of error fourteen through seventeen are overruled.

## CONSTITUTIONALITY OF ARTICLE 37.071

In points of error nineteen and twenty, Appellant argues that the mitigation special issue in Article 37.071 is "unconstitutionally vague and indefinite" in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 19, of the Texas Constitution. He specifically complains that "the jury was not given a definition of the term 'mitigating circumstances' to be used in the punishment phase." This Court has repeatedly held that the trial court need not define the terms used in the special issues because the jury is presumed to understand them without further instruction. *Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); *Feldman v. State*, 71 S.W.3d 738,

757 (Tex. Crim. App. 2002).

Applicant also complains that the trial court erroneously denied his request to declare Article 37.071 unconstitutional "because it impermissibly restricted the jury's consideration only to those circumstances which the jurors 'might regard as reducing the Defendant's moral blameworthiness.'" We have also addressed and rejected this argument in other cases. *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007). Appellant has given us no reason to revisit these holdings. Points of error nineteen and twenty are overruled.

We affirm the judgment of the trial court.

Hervey, J.

Delivered: November 20, 2013

Do Not Publish